**Venus MANDLEY et al.,
Plaintiffs-Appellants,**

v.

**James L. TRAINOR et al.,
Defendants-Appellees.**

**No. 76–1865.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 4, 1976.

Decided Nov. 23, 1976.

Rehearing and Rehearing En Banc
Denied Dec. 14, 1976.

Michael F. Lefkow, Stephen G. Seliger, Chicago, Ill., for plaintiffs-appellants.

George L. Grumley, William J. Scott, Atty. Gen., Samuel K. Skinner, U. S. Atty., William A. Barnett, Jr., Asst. U. S. Atty., Chicago, Ill., for defendants-appellees.

Before CUMMINGS and TONE, Circuit Judges, and CAMPBELL, Senior District Judge.*

---

* Senior District Judge William J. Campbell of the Northern District of Illinois is sitting by designation.

CUMMINGS, Circuit Judge.

This appeal is a sequel to the proceedings discussed in our earlier opinion reported in 7 Cir., 523 F.2d 415 (1975) (*Mandley I*). There we held that the Illinois Emergency Assistance Program for needy families with children defined eligibility more narrowly than Section 406(e)(1) of the Social Security Act (42 U.S.C. § 606(e)(1)) and therefore violated the Act. Our mandate was returned to the district court on October 24, 1975.[1] On November 26, the plaintiffs submitted a proposed final judgment and decree disposing of the controversy. A few days thereafter the state defendants filed a motion to dismiss the cause of action on the ground that on November 21, 1975, Illinois had withdrawn from participation in the Emergency Assistance Program established under Section 406(e). They did not inform the Court that they intended to carry on virtually the same program[2] under a different name but still with the usual 50 per cent federal funding as part of their regular Aid to Families with Dependent Children (AFDC) program. The record shows that this new plan was to avoid our September 25 decision and was conceived as early as November 17, 1975, and formally presented to HEW on April 23, 1976, but effective January 1, 1976. However, on November 18, the state defendants misled the Court by asserting that only state funding would be employed.

## HISTORY OF EMERGENCY ASSISTANCE AFTER *Mandley I*

In order to understand how the state defendants have vacillated between affected compliance with *Mandley I* and a final blatant disregard of the congressional eligibility requirements enforced thereby, it is necessary to trace the history of emergency assistance in Illinois after that decision became final.

At the November 17, 1975, meeting of the Illinois Legislative Advisory Committee on Public Aid, defendant Trainor submitted the recommendation dated October 30, 1975, of his Department to "Eliminate [42 U.S.C.] 606(e) Program and Create a Program for Meeting Emergent Burnout Cases to be Funded Under Section 602 and Section 603." After consideration of the Department's proposal, the Committee endorsed the Department's recommendations and requested that the Department report back to the Committee "at its April 1976 meeting with the results of this program and [its] recommendations to handle other special emergency needs which may not have been met."

In its October 30 position paper, the Department indicated that "[e]liminat[ion] [of] the 606(e) Emergency Assistance Program" was out of the question:

"The Department, although believing this [eliminating] alternative to be legally acceptable, finds this alternative totally unacceptable. The Department believes that certain Emergency conditions, such as homelessness through burn outs are needs which the Department of Public Aid clearly ought to meet and the Department would not wish to curtail its ability to do so."

"[O]fficial notification to the Department of Health, Education and Welfare that Illinois shall not request reimbursement pursuant to § 406(e) of the Social Security Act (42 U.S.C. § 606(e)) for any expenses incurred after November 21, 1975, as the Department is terminating its program for

---

1. In December 1975, the Department of Health, Education and Welfare requested and received an extension of time in which to petition the Supreme Court for certiorari. However, no petition for certiorari was ever filed. In January 1976, the Department sought to have us recall our mandate on the ground of mootness but we denied its petition on January 30, 1976.

2. In a letter dated March 9, 1976, from Director Trainor of the Illinois Department of Public Aid

to the Legislative Advisory Committee on Public Aid, Trainor revealed:

"the special needs program we substituted affords the virtually same benefits and employs the delivery system we were using prior to the Court's ruling that our program was not in accord with S406(e) of the Social Security Act. Thus, there has been no effect upon the recipients  *  *  *."

'Emergency Assistance to Needy Families with Children' existing pursuant to said § 406(e)" was given by the Department of Public Aid in a November 21, 1975, letter to HEW.

On April 23, 1976, the state defendants submitted a plan to HEW (Joint Appendix 21–132—21–140) that was consistent with this notification of November 21. The April 23 plan, discussed *infra*, is the one now in effect.

On April 26, 1976, before another meeting of the Legislative Advisory Committee on Public Aid, Trainor indicated that the Department would assent to a broader emergency assistance program to alleviate destitution:

> "After July 1, 1976, the program would be on a six-month trial basis. It would broaden the emergency needs to include persons to whom destitution exists or to whom destitution is threatened, and remedy any cause of destitution" (Tr. at 40).

On May 3, 1976, in a report to the Court, defendants averred that the:

> "Department will in all probability choose to apply for funding pursuant to § 406(e) of the Social Security Act (42 U.S.C. § 606(e) *et seq.*), when it has completed designing such an emergency assistance program and will submit the necessary State plan amendments to the Department of Health, Education and Welfare."

In the same report, defendants stated they were not "presently claiming any funds under § 606(e)."

In a May 12 report to the Court, defendants submitted a proposed plan which laid out eligibility requirements at least colorably consistent with Section 406(e)(1). At a May 17, 1976, meeting of the Legislative Advisory Committee, Representative Mann indicated that the implementation date of the broadened plan would be advanced from July 1, 1976, to April 1, 1976.

On May 19, 1976, HEW filed its comments on the May 12 plan. Acknowledging that the new plan "differs radically from the old emergency assistance program," HEW noted:

> "It is the Secretary's understanding that the plan description is merely a report to the Court concerning the present state of the Director's thinking concerning a new Illinois emergency assistance program. *When and if, that thinking crystalizes and is embodied in a completed plan, that plan will be submitted to the Secretary for approval. Until that time, the Secretary can have no formal views on the acceptability of any plan that the Director may be considering.*" (Emphasis supplied.)

Because of the broadened eligibility requirements, the plaintiffs believed that the "objections to the earlier plan [they] intended to file on May 19, 1976 [might] be unnecessary either in whole or in part," although the plaintiffs reserved the right to file objections to the amended plan.

On June 14, the Legislative Advisory Committee approved a plan with the following eligibility requirements:

> "Recipients of AFDC, AABD, GA (in units administered by the Department) and persons who could be found presumptively eligible for such programs, including any needy child under 21 and the specified relatives with whom he is living. An additional condition of eligibility is that the persons must be destitute or immediately threatened with destitution."

This plan, by its own terms, sought reimbursement, at least in part, pursuant to Section 406(e).

On June 16, 1976, the plaintiffs were served with a June 15 notice of filing in the district court of the same liberalized Emergency Assistance Program, "which in part will employ § 406(e) emergency assistance funds," that the Legislative Advisory Committee had approved on June 14. Curiously, on June 17, 1976, counsel for the State informed the plaintiffs that he had been ordered not to file the new plan. The next day, the State filed a report of status which averred that the State would not "formulate or implement any Emergency Assistance Program which in part or in whole employs federal funds pursuant to Section

406(e) of the Social Security Act." Perhaps counsel for the State was inadvertently confirming the classic Shakespearean lesson on semantics: "What's in a name? That which we call a rose by any other name would smell as sweet." (*Romeo and Juliet*, Act II, Scene ii.) At any rate, that June 15 plan was never filed in court.

The plan submitted to HEW on April 23, 1976 (Joint Appendix 21–132—21–140) was virtually the same plan as that declared illegal in *Mandley I.* Even in its brief here, Illinois lists only two minor changes in the plan submitted to HEW, neither of which has any relevancy to broadened eligibility requirements.[3] The liberal plan worked out between the April 26 and June 14 Legislative Advisory Committee hearings which HEW felt "radically different" from the pre-*Mandley I* plan has never been submitted to HEW as far as can be determined from the opaque record before us.

Rather the plan submitted to the regional office of HEW on April 23, 1976, was a program with eligibility requirements which were identical in all material particulars to the pre-*Mandley I* program. Thus on July 12, 1976, when the district judge declared the case moot, the only change with respect to the Illinois Emergency Assistance Program funded by HEW was that the source of funding had been switched from Section 403(a)(5) to Section 403(a)(1). Most importantly for our purposes, the scope of the program's eligibility requirements was identical to that of the eligibility requirements declared illegal in the pre-*Mandley I* plan.

The end result is succinctly detailed in a June 1, 1976, colloquy between the district judge and plaintiffs' counsel:

"The Court: But I don't think, as I get it, nobody is being deprived emergency assistance, although they may not get it under Section 606(a) [sic, 606(e)]

3. See note 6 *infra.*

4. In order to force a district court decision so that they would then have a final order for purposes of appeal to this Court, plaintiffs

"Mr. Lefkow: That is not correct, your Honor. Many, many people are being deprived of emergency assistance." (Tr. at 8)

## DISMISSAL OF ACTION

On December 9, 1975, the defendant Secretary of Health, Education and Welfare filed a motion to dismiss on the ground of mootness. The state and federal motions to dismiss were answered by plaintiffs and denied by Judge McMillen on December 31, 1975, and he ordered the defendants to file objections to the plaintiffs' proposed final judgment and decree within three weeks. Such objections were filed by the state defendants on January 21, 1976, and by HEW on the following day but never ruled upon.[4] Instead, after plaintiffs declined to amend their complaint further, the district judge dismissed the cause for mootness and for lack of case or controversy on July 12, 1976. This appeal followed. We reverse.

## STRUCTURE OF SUBCHAPTER IV OF THE SOCIAL SECURITY ACT AS IT RELATES TO FUNDING OF AID PROGRAMS

In order to appreciate the funding of "emergency assistance" programs, it is necessary to outline briefly the structure of Subchapter IV funding. Section 401 authorizes the Congress to appropriate for each fiscal year a sum sufficient to carry out the general purposes of Part A of Subchapter IV—Aid to Families with Dependent Children. The sums so appropriated are made available to states which have submitted AFDC plans. Only states whose plans have been approved by the Secretary of Health, Education and Welfare may receive federal funds. The criteria for approval and the mechanics of approval are set forth in Section 402.

Once a state AFDC plan has been approved, Section 403(a) directs the Secretary of the Treasury to pay funds to the state

asked us in March 1976 to mandamus the district court to decide whether or not to enter the plaintiffs' final judgment. We denied plaintiffs' petition for mandamus on March 31, 1976.

from the funds appropriated under the authority of Section 401. Subsections (1)–(5) of Section 403(a) describe the various formulae used to calculate the actual dollar amounts to be paid. Since Section 403(a) actually directs the payment of funds, it is the section of Part A which should be referred to as the "funding" provision of Part A. Section 403(a)(5) provides that the Secretary of the Treasury shall pay 50 per cent of a state's expenditures for "emergency assistance" to needy families with children. It is the only part of Section 403(a) dealing with "emergency assistance."

## THE DEFENDANTS' FRAMING OF THE MOOTNESS ISSUE

At the time of *Mandley I* the state defendants were receiving emergency assistance funds under Section 403(a)(5). These funds were expended under the State's plan as "emergency assistance to needy families with children" as defined by Section 406(e)(1).

We are now advised that Illinois has ceased receiving funds pursuant to Section 403(a)(5) with the attached "strings" of Section 406(e)(1). Instead the State is receiving federal funds for emergency assistance under its regular AFDC plan pursuant to Section 403(a)(1). Since Section 403(a)(1) does not on its face include the term "emergency assistance to needy families with children," the State argues that the funds expended under Section 403(a)(1) no longer come with the attached "strings" of Section 406(e)(1). Defendants argue that the mandatory application of Section 406(e)(1) eligibility standards to the states announced in *Mandley I* occurs only if federal funding is received pursuant to Section 403(a)(5). Their argument concludes that since funding is now received only under Section 403(a)(1), the case is moot. Plaintiffs coun-

ter by alleging a circumvention of *Mandley I* by this change in funding.

## SCOPE OF THE PRESENT CONTROVERSY

■ As a threshold matter, we must consider whether the plaintiffs' pleadings are broad enough to permit us to decide whether the defendants' change of funding is an artifice to avoid the *Mandley I* mandate. The amended complaint is an action brought to secure rights established by Section 406(e)(1) of the Social Security Act. Those are the rights that plaintiffs still seek to vindicate. The developments that took place after *Mandley I* were covered by the federal and state defendants' motions to dismiss, the plaintiffs' answer thereto, and the supporting documents filed by the respective parties. The very issue now before us was thus submitted and before the district court without the need of further amendments to the complaint.

■ This case is not moot, for the state defendants are still operating an emergency assistance program with matching federal funds, although under the guise of a "special assistance" program.[5] There is a live case or controversy because plaintiffs maintain that the state defendants must still comply with the standards of Section 406(e)(1) as long as federal funding is used for this program, while the state and federal defendants remain juxtaposed against plaintiffs.

## WHETHER SECTION 406(e)(1) "STRINGS" ATTACH TO EMERGENCY ASSISTANCE REGARDLESS OF FUNDING

*The Effect of Section 1318.* Before reaching the ultimate issue—whether Section 406(e)(1) "strings" attach to emergency assistance regardless of funding—we must verify whether the present funding actually

5. Since we answer the issue of mootness at this fundamental level, we need not pass on the plaintiffs' answer to the defendants' motions to dismiss on grounds of mootness wherein they allege that "defendants intend by a technical maneuver to suspend temporarily requesting funds under § 406(e), to persuade this [district] court to dismiss the case as moot based on that suspension, and once the case is dismissed to return to § 406(e) funding without any prohibitions, injunctive or otherwise, from this [district] court." (Plaintiff's Memorandum in Opposition to Motions to Dismiss, December 17, 1975, at 5).

occurs under Section 403(a)(1). This is because HEW has recently informed us that the federal funding is solely under 42 U.S.C. § 1318. Section 1318 provides in pertinent part:

> "In the case of any State which has in effect a plan approved under subchapter XIX of this chapter for any calendar quarter, the total of the payments to which such State is entitled for such quarter, and for each succeeding quarter in the same fiscal year (which for purposes of this section means the 4 calendar quarters ending with June 30), under paragraphs (1) and (2) of section * * * 603(a), * * * of this title shall, at the option of the State, be determined by application of the Federal medical assistance percentage (as defined in section 1396d of this title), instead of the percentages provided under * * * such section, to the expenditures under its State plans approved under * * * part A of subchapter IV of this chapter, which would be included in determining the amounts of the Federal payments to which such State is entitled under such section, but without regard to any maximum on the dollar amounts per recipient which may be counted under such section."

This provision as it relates to Section 603(a) (Section 403(a) of the Social Security Act) was added in 1968 by the Social Security Amendments of 1967. 1 U.S.Code Cong. & Admin.News 1042 (1967). The 1965 provision it amended was itself put in the Social Security Act merely to:

> "permit any State which has in effect a plan approved under the new title XIX [Medicaid] to claim Federal participation in its expenditures under all of its Federal-State public assistance programs by application of the new formula contained in title XIX instead of using the varying formulas in the existing titles." 1 U.S. Code Cong. & Admin.News 2265 (1965).

Indeed Section 1318, by its own terms, acknowledges that the entitlement for funding payments is still provided under Section 603(a) (Section 403(a) of the Social Security Act). Thus the interaction between Sections 603(a) and 1318 preserves the former's status as the funding provision with the effect of the latter here to maintain the same 50 per cent federal and 50 per cent state rate of funding that exists for emergency assistance to needy children under Section 403(a)(5) of the Act. At any rate, even if the funding were now solely under Section 1318, HEW states that "does not materially change the argument of the appellee [HEW]" (Nov. 1, 1976, HEW motion to correct its brief). The state defendants have not mentioned Section 1318 orally or on brief, evidently also realizing it does not change their position. As with emergency assistance funding under Section 403(a)(5), Illinois receives a 50 per cent federal share for its AFDC program under Section 1318 alone or in combination with Section 403(a)(1).

■ *The Ultimate Issue.* The state defendants admit that they are conducting the same program under the label "special assistance" that they formerly conducted under the label of emergency assistance, with minor exceptions.[6] Illinois contends that the service it formerly gave under Section 406(e)(1) as emergency assistance to needy families with children is now given under Section 402 as part of aid to needy families with children. Instead of seeking federal funding for the program under Section 403(a)(5) authorizing the Secretary of the Treasury to pay 50 per cent of the total amount expended by a state under its plan for emergency assistance to needy families with children, the state defendants assert that they now obtain federal funding under Section 403(a)(1) providing that the Secretary of the Treasury pay each state which has an approved AFDC plan certain

---

6. At HEW's suggestion, effective October 12, 1976, the state defendants removed the restriction limiting special assistance payments to once in any 12 consecutive months. Simultaneously, they no longer authorized the payment of moving costs as a result of court-ordered eviction. AFDC Manual, Release No. 76.46 (October 12, 1976), amending Manual Chapter 600.

amounts as computed thereunder. We hold that the Illinois defendants cannot avoid the eligibility requirements of Section 406(e)(1) by relabeling the plan as part of AFDC under Section 402 while still receiving 50 per cent federal funding for what is really Section 406(e)(1) emergency assistance to children.

■ Stripped to the bone, our holding is founded on the premise that Section 403(a)(5) is the exclusive provision for federal funding of emergency needs under Part A of Subchapter IV. Section 406(e)(1), edited for present purposes, provides:

> "The term 'emergency assistance to needy families with children' means any of the following [furnished during a defined time period to people meeting defined eligibility standards]—

> "(A) money payments, payments in kind, or such other payment as the State agency may specify with respect to, or medical care or any other type of remedial care recognized under State law on behalf of, such child or any other member of the household on which he is living, and

> "(B) such services as may be specified by the Secretary;

> *but only with respect to a State whose State plan approved under Section 602 [Section 402 of Social Security Act] of this title includes provision for such [emergency] assistance.*" (Emphasis supplied.)

Clearly the State has the option of whether or not to include a provision in its state plan in order to receive federal funding under Section 403(a)(5) for Section 406(e)(1) emergency assistance. The legislative history of Section 406(e) reinforces this reading of the statute. As the Senate Finance Committee's report stated:

> "a new program optional with the States would authorize dollar-for-dollar Federal matching to provide temporary assistance to meet the great variety of situations faced by needy children in families with emergencies." 2 U.S.Code Cong. & Admin.News 2838 (1967).

But the fact that a State has the option of whether or not to claim federal funding under Section 403(a)(5) for Section 406(e)(1) emergency assistance is totally distinct from the question of whether a state has the option to choose whether to receive federal funding for emergency needs under Section 403(a)(5) or 403(a)(1). We conclude the state does not enjoy such an option.

HEW's principal argument is that Section 403(a)(5) merely provides an additional source of monies for state emergency assistance plans. The total amount of funds appropriated in a given year for AFDC by the Congress is allocated according to the applicable formula in Section 403(a)(1). In any given year, the Section 403(a)(1) formula would determine a fixed dollar amount. Thus to the extent that federal funding for a "special assistance" program is sought from the total amount of monies in a year allocated to fund Section 403(a)(1) AFDC programs, these other programs presumably would be reciprocally limited. Since Section 403(a)(5) draws on a different block of the funds appropriated for emergency assistance in any given year, a similar limiting tension would not exist on state emergency programs funded under Section 403(a)(5). In this sense, Section 403(a)(5) funding is "additional." But by underscoring these funding subtleties, HEW has shown why Section 403(a)(5) should be construed as the exclusive funding provision for emergency assistance. The 1967 amendments were introduced to correct the unsatisfactory delivery of state emergency assistance. Those amendments would be undermined if HEW's construction were permitted to create this limiting tension on Section 403(a)(1) AFDC funds while the Section 403(a)(5) block of funds appropriated by Congress for emergency assistance in a given fiscal year lies unused.

■ When Congress added the emergency aid for children provisions to the Social Security Act in 1967, Senator Curtis explained them on the floor of the Senate (113 Cong.Rec. 36319 (1967)):

> "Now, Mr. President, I should like to refer to another new provision in this

measure. *For the first time, the Federal Government will match money for emergency assistance. This has not been in the law before.* For a period of 30 days, emergency assistance can be paid in cases where they cannot meet other qualifications. Many of the States have asked for this provision, and it is one that should be looked at by those who say they will reject this bill because it is not liberal. It would do many of the things for which States, welfare directors, and others have been asking for a long time." (Emphasis supplied.)

Speaking directly after the acceptance of the Conference Report by the Senate, Senator Mansfield indicated the 1967 amendments' scope as follows (113 Cong.Rec. 36925 (1967)):

"Families with emergency trouble will be able to receive emergency assistance in whatever form it is best for them at their time of need. Families which have been burned out, suffered personal tragedies and such will be able to get money, medical care, shelter provided, food sent in, or whatever else is needed to deal with the crisis. The committees are to be commended for adding this provision, thus recognizing that emergencies which strike families cannot be dealt with by business-as-usual methods.

"Sometimes emergencies which strike families reveal deep-seated problems which establish that the children are in danger of exploitation or abuse. Under the legislation, States are required to have, in advance, plans to deal with these situations. This means working closely with the courts and being prepared, when necessary, to find places for children removed from the home by the courts. For these children, previous provisions have been inadequate. Under the new legislation, the financing will be sufficient to assure that the child may be placed in a safe place with the Federal Government paying its share of the cost."

The tenor of these remarks shows the importance of the program and that participating states would have to provide a plan approved by HEW. Emergency assistance was meant to supplement normal AFDC payments. As the Senate Finance Committee reported:

"The Committee understands that the process of determining AFDC eligibility and authorizing payments frequently precludes the meeting of emergency needs when a crisis occurs. In the event of eviction, or when utilities are cut-off, or when an alcoholic parent leaves children without food, immediate action is necessary. It frequently is unavailable under State programs today." (2 U.S.Code Cong. & Admin.News 3002 (1967)).

The federal regulations require that "emergency assistance will be given forthwith" (45 C.F.R. Section 233.120(a)(5)), but Congress provided in Section 406(e)(1) that emergency assistance should be furnished only once in any 12-month period. It is thus apparent that regular AFDC public assistance was administratively and congressionally distinguished from emergency assistance, which is a one-time grant to "avoid destitution" (Section 406(e)(1)). As we held in *Mandley I,* relying in part on additional legislative history, Congress intended the eligibility provisions of Section 406(e)(1) to be mandatory on states giving emergency assistance. 523 F.2d at 420–423. To like effect, see *Williams v. Wohlgemuth,* 540 F.2d 163 (3d Cir. 1976); Note, Meeting Short-Term Needs of Poor Families: Emergency Assistance for Needy Families with Children, 60 Corn.L.Rev. 879, 886–891 (1975) (hereinafter cited as Cornell Note). In our view, the synergistic sum of all these factors results in the conclusion that Congress intended Section 403(a)(5) to be the exclusive source of federal funding in Part A of Subchapter IV of the Social Security Act for the Section 406(e) emergency assistance needs of the citizens of the states.

Illinois cannot evade the Section 406(e)(1) eligibility requirements by relabeling its emergency assistance program as AFDC "special assistance" while still obtaining matching funds from the federal government. See *Youakim v. Miller,* 425 U.S. 231,

96 S.Ct. 1399, 47 L.Ed.2d 701.[7] If that were permissible by a mere change in nomenclature, the requirements of Section 406(e)(1) would be totally eviscerated.[8] Therefore, if Illinois continues to accept federal funds for its "special assistance" program, the guidelines established by Congress in Section 406(e)(1) must be met (*Williams v. Wohlgemuth, supra,* at 170 n.37; *Lynch v. Philbrook* (D.Vt.1976)), and HEW must continue to provide half the funding under Section 403(a)(5), as it formerly did with respect to Illinois.

We may take note that state funds available for expenditure on welfare programs are tightly limited. The Senate Finance Committee's report shows that through emergency assistance Congress meant "[t]o encourage public welfare agencies to move promptly and with maximum effectiveness in [emergency situations]." 2 U.S.Code Cong. & Admin.News 3003 (1967). Congressman Mills noted in the debates that with emergency assistance, the House believed "that encouraging the States to move quickly in family crises, supplying the family · promptly with appropriate services, would in many cases preclude the necessity for the family having to go on [AFDC] assistance on a more or less permanent basis." 113 Cong.Rec. 23054 (1967). Funding with Section 406(e)(1) eligibility requirements for emergency assistance requires the states to meet the needs of a broader class of individuals. Cornell Note, *supra,* at

883, 884. The total state share, assuming maintenance of the present level of benefits,[9] for funding emergency needs when the federal matching share comes under Section 403(a)(5) would normally be larger than if the federal funding comes under AFDC Section 403(a)(1) (whether singly or in conjunction with Section 1318), a provision ostensibly free of the Section 406(e)(1) eligibility requirements. Congress would be thwarted in its aim to encourage the provision of emergency relief to those children whom it intended as targets if a state had the choice of claiming emergency assistance funds under Section 403(a)(1) for AFDC without the "strings" of Section 406(e)(1).

## RELIEF

This case concerns emergency needs of people in dire straits. Yet over three years have passed since the filing of the complaint and over one year has gone by since the return of our mandate in *Mandley I.* Therefore, we now consider *sua sponte* the objections of the defendants to the merits of plaintiffs' proposed final judgment of November 26, 1975. Cf. *Hartford-Empire Co. v. United States,* 323 U.S. 386, 410–435, 65 S.Ct. 373, 89 L.Ed. 322.

The state defendants object principally on the grounds that Section "406(e) funding" is no longer utilized by Illinois. For the reasons stated above, we cannot sustain this line of objection.[10] Lest Illinois mistak-

---

**7.** In discussing *Youakim,* HEW has recognized that for a foster care plan to be funded under Section 403(a)(1) or 1318, it must meet the inclusion requirements in Section 408 (Br. 11). Similarly here, even if an emergency assistance plan (by whatever name) is funded under Section 403(a)(1) or 1318, it must meet the eligibility requirements of Section 406(e)(1). In the words of another metaphor of the same genus, whatever Illinois presently dubs its emergency assistance plan, "a rose is a rose is a rose."

**8.** The *amici curiae,* various private charities, state in their brief that if this were

"successful, [Illinois] would make permanent the transfer of the burden of providing for most emergencies to the private social welfare organizations in violation of the basic principles of both federal and state welfare policy."

**9.** Of course, the level of state benefits does not have to remain constant. As we said in *Mandley I*:

"Because Illinois has accepted federal funds to operate an emergency assistance program, it is bound by the eligibility provisions of 42 U.S.C. § 606(e). This need not result in additional expense to the state but with existing appropriations should at least result in helping a broader number of persons, although more moderately than at present." 523 F.2d at 423.

**10.** The state defendants also apparently maintain that *Purnell v. Edelman,* 511 F.2d 1248 (7th Cir. 1974), is a form of *stare decisis* upon our decision here. In the words of defendants' objection:

"That case presented a problem to the Trial Court on remand identical to the instant situ-

enly understand this opinion to strip it of control over the implementation of its emergency assistance program, we hereby reaffirm our observations in *Mandley I* :

"Illinois, should it elect to continue to provide an emergency assistance program in the future, will still have substantial control of its program. It will be able to choose the level of benefits that it will provide and to set the standard of need. It may reasonably limit the amounts paid out in emergency assistance, *Dandridge v. Williams*, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491, but it will not be able to declare ineligible those who come within the federal definition of eligibility in Section 606(e). This Court need not establish the exact meaning of the eligibility provisions of Section 606(e) because this case requires only that the validity of the specific Illinois program be determined. The problem of setting workable definitions for the somewhat amorphous eligibility criteria in Section 606(e) may be addressed by HEW rule-making. Such rule-making should aid the states in preparing programs that are in accord with the eligibility criteria set by Congress." 523 F.2d at 422–423.

■ Part of the proposed final judgment orders HEW to file a proposed regulation with the district court to conform to our opinion. HEW contends that a federal district court has "no authority to order the performance of a discretionary act, such as the adoption of any particular regulation." But the duty of the Secretary to promulgate regulations implementing the provi-

sions of the Social Security Act is a mandatory one. 42 U.S.C. § 1302. Implicit in HEW's objection is the notion that ordering the promulgation of regulations is an untoward invasion of the province of the Secretary. This contention has been persuasively answered by the Second Circuit. In *Kingsbrook Jewish Medical Center v. Richardson*, 486 F.2d 663 (2d Cir. 1973),[11] the court reversed

"the order below and remand[ed] to the district court with instructions to grant Kingsbrook's motion for summary judgment, to the extent of directing the Secretary of Health, Education and Welfare to promulgate regulations consistent with the interpretation [42 U.S.C.] 1395x(v)(1) that we have announced." 486 F.2d at 670.

In an explanatory footnote, the court observed that:

"Where there are no material issues of fact in dispute, an appellate court reviewing the dismissal of a complaint can, upon reversal, also remand with directions to grant summary judgment on appellant's previously denied cross-motion. Under the circumstances present here 'we perceive no reason for not bringing this litigation to an end.' *Stein v. Oshinsky*, 348 F.2d 999, 1002 (2d Cir. 1965); 6 J. Moore, Federal Practice ¶ 56.13 at 2251–52 (2d ed. 1972)."

Since the defendants did not object to the findings of fact in the plaintiffs' final judgment, we can perceive no reason not to bring the instant case "to an end."

---

ation. In *Purnell,* the Illinois Department of Public Aid chose to cease its participation in the same 406(e) Emergency Assistance program of utility service 'turnons' and instead adopted a different mode of handling the problem which did not use § 406(e) funds. Plaintiffs, on remand to the Court below, sought a Rule to Show Cause why the Defendants should not be held in contempt of Court. Upon being satisfied that the state was no longer claiming funds under the 406(e) Emergency Assistance program, *plaintiffs withdrew their motion for a rule.* In that case withdrawal from the 406(e) program was sufficient to moot the controversy." (Emphasis supplied.)

The answer to this objection is immediate. In *Purnell,* the plaintiffs withdrew their own motion on the propriety of the State's funding of emergency assistance with federal funds not subject to Section 406(e) eligibility standards, thereby voluntarily mooting the case. But in *Mandley II* the plaintiffs, far from voluntarily mooting their own case, are vigorously pursuing an attack on the validity of the state's emergency assistance program.

**11.** Professor Davis has approvingly characterized this case as an instance of a court being "guided by [its] usual common sense." K. Davis, Administrative Law of the Seventies, § 23.-09 at 545 (1976).

Paragraph B–1 of the proposed final judgment purports to order the Secretary to include some specific items in the regulation, *viz.* "definitions of such terms as 'necessary to avoid destitution' and 'lack of available resources' which are compatible with providing emergency assistance when a needy child is approaching destitution." While it would be salutary to include such definitions in the new regulation and while the Secretary might find it necessary as a matter of administrative practicality to include them, we will not order HEW specifically to include any items in its new regulation.[12] Of course, whatever regulations the Secretary issues must be consistent with today's opinion and *Mandley I.*

We have considered the defendants' other objections to the proposed judgment and find them without merit. Because there has been no compliance with our previous mandate for more than a year, we direct the district court to enter plaintiffs' proposed judgment forthwith except with respect to the definitional aspect of Paragraph B–1. In addition, finding of fact 7 should be deleted as obsolete, and Paragraph A–1(c) must be modified in accord with note 12. A fresh mandate will issue and be returned to the district court this day.

Judgment reversed and remanded for further proceedings consistent herewith.

---

**12.** Because of this change, Paragraph A–1(c) of the final judgment is modified to commence "Until HEW files regulations under Paragraph B–1 below,".