QUERN, DIRECTOR, DEPARTMENT OF PUBLIC AID
OF ILLINOIS, ET AL. *v.* MANDLEY ET AL.

No. 76–1159.   Argued November 30, 1977—Decided June 6, 1978*

---

*Together with No. 76–1416, *Califano, Secretary of Health, Education, and Welfare* v. *Mandley et al.*, also on certiorari to the same court.

STEWART, J., delivered the opinion of the Court, in which all other Members joined except BLACKMUN, J., who took no part in the consideration or decision of the cases.

*George W. Lindberg,* First Assistant Attorney General of Illinois, argued the cause for petitioners in No. 76–1159. With him on the briefs were *William J. Scott,* Attorney General, and *Paul J. Bargiel* and *Paul V. Esposito,* Assistant Attorneys General. *Deputy Solicitor General Jones* argued the cause for petitioner in No. 76–1416. With him on the brief were *Solicitor General McCree, Assistant Attorney General Babcock, Marion L. Jetton, William Kanter,* and *Harry R. Silver.*

*Michael F. Lefkow* argued the cause for respondents in both cases. With him on the brief was *Stephen G. Seliger.*†

MR. JUSTICE STEWART delivered the opinion of the Court.

These cases require examination of the interplay between state option and federal mandate within the system of cooperative federalism created by the public assistance programs of Title IV–A of the Social Security Act, 42 U. S. C. § 601 *et seq.* The ultimate question to be decided is whether a

---

†*William F. Hyland,* Attorney General, *Stephen Skillman,* Assistant Attorney General, and *Richard M. Hluchan,* Deputy Attorney General, filed a brief for the State of New Jersey as *amicus curiae* urging reversal.

*Theodore C. Diller* and *Deborah C. Franczek* filed a brief for the United Way of Metropolitan Chicago et al. as *amici curiae* urging affirmance.

*Francis X. Bellotti,* Attorney General, and *S. Stephen Rosenfeld* and *Garrick F. Cole,* Assistant Attorneys General, filed a brief for the Commonwealth of Massachusetts as *amicus curiae.*

State may ever receive federal matching funds for a program of emergency assistance to needy families, either under the general program of Aid to Families with Dependent Children (AFDC) [1] or under the specific provisions for Emergency Assistance to Needy Families with Children (EA), [2] if it limits

---

[1] The AFDC program is established and defined in several related provisions of Title IV–A of the Social Security Act. Section 406 (b) of the Act, as set forth in 42 U. S. C. § 606 (b), provides in pertinent part: "The term 'aid to families with dependent children' means money payments with respect to, or . . . medical care in behalf of or any type of remedial care recognized under State law in behalf of a dependent child . . . ." The term "dependent child" is defined in § 406 (a), 42 U. S. C. § 606 (a), as

"a needy child (1) who has been deprived of parental support or care by reason of the death, continued absence from the home, or physical or mental incapacity of a parent, and who is living with [specified relatives] in a place of residence maintained by one or more of such relatives as his or their own home, and (2) who is (A) under the age of eighteen, or (B) under the age of twenty-one and (as determined by the State in accordance with standards prescribed by the Secretary) a student regularly attending a school . . . [or] course of vocational or technical training . . . ."

[2] Section 406 (e) of the Act, as set forth in 42 U. S. C. § 606 (e), provides in pertinent part:

"(1) The term 'emergency assistance to needy families with children' means any of the following, furnished for a period not in excess of 30 days in any 12-month period, in the case of a needy child under the age of 21 who is . . . living with any of the relatives specified in subsection (a) (1) . . . but only where such child is without available resources, the payments, care, or services involved as necessary to avoid destitution of such child or to provide living arrangements in a home for such child, and such destitution . . . did not arise because such child or relative refused without good cause to accept employment or training for employment—

"(A) money payments, payments in kind, or such other payments as the State agency may specify . . . or medical care or any other type of remedial care recognized under State law on behalf of, such child or any other member of the household in which he is living, and

"(B) such services as may be specified by the Secretary;

"but only with respect to a State whose State plan approved under section 602 of this title includes provision for such assistance.

"(2) Emergency assistance as authorized under paragraph (1) may be

eligibility for such aid more narrowly than the federal EA statute.

## I

Title IV–A of the Social Security Act establishes several different public aid programs under the general rubric of "Grants to States for Aid and Services to Needy Families with Children." In order to receive federal funds under any of the Title IV–A programs a State must adopt a "state plan for aid and services to needy families with children" that is approved by the United States Department of Health, Education, and Welfare (HEW) as meeting the requirements set forth in § 402 of the Act.

AFDC is the core of the Title IV–A system. As the Court observed in one of its earliest forays into Title IV, AFDC is a categorical aid program, and "the category singled out for welfare assistance . . . is the 'dependent child,' who is defined in § 406 of the Act . . . as an age-qualified 'needy child . . . who has been deprived of parental support or care by reason of the death, continued absence from the home, or physical or mental incapacity of a parent, and who is living with' any one of several listed relatives." *King* v. *Smith*, 392 U. S. 309, 313. A State's expenditures for AFDC, under an approved § 402 state plan, are reimbursed by the Federal Government according to the formula set forth in § 403 (a)(1).

The federal EA program was added to Title IV as part of the omnibus Social Security Amendments of 1967. Pub. L. 90–248, § 206, 81 Stat. 893. It was described in the Senate Finance Committee report as "a new program optional with the States [to] authorize dollar-for-dollar Federal matching to provide temporary assistance to meet the great variety of situations faced by needy children in families with emergencies." S. Rep. No. 744, 90th Cong., 1st Sess., 4 (1967).

---

provided . . . to migrant workers with families in the State or in such part or parts thereof as the State shall designate."

To participate in the program a State must include a provision for EA in its § 402 state plan, and funding at a flat rate of 50% of program expenses is authorized by § 403 (a)(5).

Unlike AFDC, eligibility for EA is not limited to "dependent children." Instead, the term "emergency assistance to needy families with children" is broadly defined in § 406 (e) to include money payments and other kinds of aid provided on a temporary basis "to avoid destitution . . . or to provide living arrangements" for a "needy child under the age of 21 who is . . . without available resources." 42 U. S. C. § 606 (e)(1). Thus under the EA statute, federal matching funds are available for emergency aid to intact families with children if threatened with destitution, regardless of the cause of their need.

The State of Illinois, however, elected to adopt an EA program of much narrower scope. It provided only for (1) aid to AFDC families who were without shelter as a result of either damage to their homes or court-ordered eviction for reasons other than nonpayment of rent; and (2) aid to applicants determined to be presumptively eligible for AFDC who were in immediate need of clothing or household furnishings.

In 1973 the respondents instituted a class action against state and federal officials on behalf of all "AFDC recipients, applicants for AFDC, and other families with needy children" in Illinois seeking a declaratory judgment that the Illinois EA program violated federal law by defining eligibility more narrowly than § 406 (e)(1), and an injunction restraining the defendants from administering the allegedly unlawful program.[3] The United States District Court for the Northern

---

[3] The complaint also alleged that the Illinois program violated the Equal Protection Clause of the Fourteenth Amendment and the Illinois Public Aid Code.

While none of the defendants questioned the District Court's subject-matter jurisdiction, the Court of Appeals properly considered the question *sua sponte*. It held that the District Court had jurisdiction of claims

District of Illinois held in an unreported opinion that the State's program was not inconsistent with federal law. The Court of Appeals for the Seventh Circuit reversed this judgment, ruling that "Illinois may no longer conduct an emergency assistance program under [§ 406 (e)] in which some of the families with needy children described in [§ 406 (e)] are given aid and some are not." *Mandley* v. *Trainor,* 523 F. 2d 415, 423 *(Mandley I).*

After the Court of Appeals' mandate was returned to the District Court, the plaintiffs submitted a proposed final order requiring the State to conform its EA program to the provisions of § 406 (e) and further requiring the federal defendants to promulgate regulations consistent with the Court of Appeals' interpretation of the statute. The state and federal defendants not only opposed the substantive terms of the proposed order, but also filed motions to dismiss the complaint altogether on the ground that the case had been rendered moot by the State's decision to withdraw entirely from the EA program. In support of its motion the State filed an affidavit from the Chief Fiscal Officer of its Department of Public Aid stating that "the Department would immediately cease all activities and requests for federal reimbursement pursuant to the 'Emergency Assistance' program of § 406 (e) of the Social Security Act" and that "no additional § 406 (e)

---

against the state defendants under 28 U. S. C. § 1343 and 42 U. S. C. § 1983 since the plaintiffs' constitutional claims were not insubstantial. *Mandley* v. *Trainor,* 523 F. 2d 415, 419 n. 2 *(Mandley I).*

It found the question of jurisdiction over the federal defendants more troublesome, *ibid.* We express no view as to the Court of Appeals' theory of jurisdiction in light of the intervening amendment of 28 U. S. C. § 1331, which, by eliminating the requirement of $10,000 in controversy in any action "against the United States, any agency thereof, or any officer or employee thereof in his official capacity," 28 U. S. C. § 1331 (a) (1976 ed.), clearly confers jurisdiction over the federal defendants in these cases. *Andrus* v. *Charlestone Stone Products Co., ante,* at 607–608, n. 6.

federal funds [would] be drawn for the balance . . . of the current fiscal year."

In opposing the motions to dismiss, the plaintiffs argued that even though the State would no longer request federal reimbursement for emergency aid under §§ 406 (e) and 403 (a)(5), it intended nonetheless to operate virtually the identical program as an AFDC "special needs" program and to seek federal reimbursement under § 403 (a)(1).  They contended that such a course of conduct would be equally unlawful.  The District Court took the position that the validity of any proposed program under the AFDC provisions presented a new question that had not been raised in the original lawsuit, and that the plaintiffs' challenge to the § 406 (e) program had indeed been rendered moot by the State's decision to withdraw altogether from the EA program.  When the plaintiffs declined to amend their complaint to allege that the new program would also be in violation of § 403 (a)(1), the District Court entered an order dismissing the cause "for lack of case or controversy."

The Court of Appeals again reversed.  *Mandley* v. *Trainor*, 545 F. 2d 1062 (*Mandley II*).  Noting that the defendants "admit[ted] that they [were] conducting the same program under the label 'special assistance' that they formerly conducted under the label of emergency assistance," *Id.*, at 1068, the Court of Appeals held that the change in funding arrangements did not raise issues beyond the scope of the plaintiffs' pleadings, and did not render the case moot.  As the appellate court viewed the situation, the plaintiffs were still claiming, as they always had, that any federally funded program for emergency assistance must conform with the eligibility standards of § 406 (e)(1), and that the defendants were still violating the federal law by using federal funds to operate an emergency assistance program that defined eligibility more narrowly than § 406 (e)(1).  On the merits the Court of Appeals agreed with the plaintiffs that § 403 (a)(5)

is the exclusive source of federal funds for a program of emergency assistance, and therefore held that Illinois' proposed new program, as a *de facto* EA program, must extend aid to all persons eligible under § 406 (e)(1).

Because of the lengthy and, in its view, wrongful delay in the implementation of its *Mandley I* mandate, the Court of Appeals then considered *sua sponte* the defendants' objections to the terms of the final order that had been proposed by the plaintiffs after the first remand, and directed the District Court on remand to enter the proposed order with minor modifications. As to the state defendants this order would provide:

> "Defendants . . . are enjoined, so long as Illinois receives federal funding under Title IV–A of the Social Security Act, from claiming reimbursement for emergency assistance (however designated) under any other section of the Act than §§ 406 (e) and 403 (a)(5) and are enjoined from using any other means of limiting eligibility for emergency assistance more narrowly than the provisions of § 406 (e), and are further enjoined from denying emergency assistance . . . to any member of the plaintiff class with a needy child [who is eligible under the definition in § 406 (e)]." [4]

In addition the Secretary of HEW was to be

> "enjoined from approving state plans for emergency assistance which limit eligibility more narrowly than

---

[4] As stated in the order, any child:

"(i) who is under the age of 21,

"(ii) who is living with any of the relatives specified in § 406 (a)(1) of the Act in a place of residence maintained by such relative as a home,

"(iii) where such child is without available resources,

"(iv) where emergency assistance is necessary to avoid destitution of or to provide living arrangements in a home for such child, and

"(v) such destitution did not arise because such child or relative refused without good cause to accept employment or training for employment."

§ 406 (e) of the Act or funding an emergency assistance program (however designated) under any provision of the Act other than §§ 406 (e) and 403 (a)(5)." [5]

The broad injunction ordered by the Court of Appeals raises two distinct statutory questions: whether a program of emergency aid to AFDC families may qualify for federal funding under a provision other than § 403 (a)(5), and more particularly as an AFDC "special needs" program under § 403 (a)(1); [6] and whether a State that adopts an EA program under §§ 403 (a)(5) and 406 (e) must define eligibility no more narrowly than § 406 (e). [7] We granted certiorari, 431

[5] The order would further require HEW to "file with the court proposed regulations governing emergency assistance, which proposed regulations shall be in accord with the opinion of the Court of Appeals, with this order and with 45 CFR § 233.10 (a)(1)(ii)(A)."

The plaintiffs' originally proposed order would have specifically required that the regulations "include, inter alia, definitions of such terms as 'necessary to avoid destitution' and 'lack of available resources' which are compatible with providing emergency assistance when a needy child is approaching destitution." While the Court of Appeals thought "it would be salutary to include such definitions in the new regulation," it declined to "order HEW specifically to include any items in its new regulation." 545 F. 2d, at 1073.

[6] The petitioners have not raised in this Court the claim that the validity of the proposed AFDC special-needs program was beyond the scope of the pleadings in this case.

[7] We agree with the Court of Appeals that the cases were not rendered moot by Illinois' decision to withdraw from the § 406 (e) program. For even if the proposed arrangement is entirely legal under §§ 402 and 403 (a)(1), the State's decision to withdraw voluntarily from the § 406 (e) program in no way mooted the Court of Appeals' prior determination that that program was being operated in violation of federal law. See *United States* v. *W. T. Grant Co.*, 345 U. S. 629.

By granting the defendants' motions to dismiss, as it was bound to do if the case was indeed moot, the District Court rendered the entire proceeding a nullity. There was no longer any judgment binding on the defendants to prevent them from returning to the old program. And, while the defendants' good-faith representation that they had no inten-

U. S. 953, to consider these important questions affecting the nationwide administration of a major federal welfare program.

## II

As the Court of Appeals readily conceded, its holding in *Mandley I* that federal eligibility standards are mandatory upon States that adopt the optional EA program in no way obligates a State to continue that program. The federal definition of eligibility in § 406 (e), like the other provisions of Title IV of the Social Security Act, simply governs the dispensation of federal funds. See *Townsend* v. *Swank,* 404 U. S. 282, 292 (BURGER, C. J., concurring in result). And while Congress may attach strings to its offer of federal funding, it does not require the States to accept any federal funds at all.

The Court of Appeals also acknowledged that § 406 (e)

---

tion of doing so might properly have led the District Court to deny injunctive relief, see *Hecht Co.* v. *Bowles,* 321 U. S. 321, it could not operate to deprive the successful plaintiffs, and indeed the public, of a final and binding determination of the legality of the old practice. *United States* v. *W. T. Grant Co., supra,* at 632.

Since the Court of Appeals correctly concluded that the District Court had erred in dismissing the case as moot, the controversy was still alive as to the legality of both the old EA program and the proposed AFDC special-needs program. We note that, in a status report to the Illinois Advisory Committee on Public Aid, the State's Director of the Department of Public Aid stated that he intended to request that "HEW clarify its [§ 406 (e)] Emergency Assistance Program [since] there are aspects of a [§ 406 (e)] program that we feel superior to a special need program and we would prefer, if so allowed, to maintain the [§ 406 (e)] Emergency Assistance Program of the present scope." (This status report was filed in the District Court as Exhibit 1 to Plaintiffs' Answer to Defendants' Motions to Dismiss.) Thus while the Court of Appeals had already passed on the legality of the Illinois EA program in *Mandley I,* there was no *jurisdictional* bar to its directing entry of a judgment on remand from *Mandley II* resolving the entire dispute by enjoining the operation of both programs.

does not by its own terms attach any eligibility "strings" to a program funded under the AFDC provisions. If Illinois' plan to meet the emergency needs of AFDC recipients by means of AFDC "special needs payments" was proper under § 403 (a) (1), the broader EA eligibility definition would have no application. The Court of Appeals believed, however, that the requirements of § 406 (e) would be "totally eviscerated" if States could evade them simply by resorting to the AFDC provisions. This effect, in its view, compels the conclusion that § 403 (a) (5) is the exclusive source of federal funds for emergency needs, and therefore that emergency payments of the kind contemplated by the Illinois plan [8] cannot be reimbursed under § 403 (a) (1) as AFDC "special needs."

## A

Even assuming the Court of Appeals' premise that § 406 (e) does impose mandatory standards of eligibility for EA, its conclusion simply does not follow. If a State adopts a program that is, for whatever reason, *not* a proper EA program, it is no "evasion" of the requirements of § 406 (e) to seek alternative funding. It is merely an election not to operate an EA program, but to do something quite different instead. Since the statute clearly offers the States an option whether or not to adopt an EA program, it is in no sense "eviscerated" when a State chooses to forgo the offer.

The legislative history does not indicate a contrary intent. The Court of Appeals found highly significant the description

---

[8] The record does not contain an actual proposal for the contemplated special-needs program, since Illinois had not at the time of the Court of Appeals' decision drafted or submitted such a plan to HEW for approval. The court assumed, and the parties agreed, that the program would parallel the old EA program: *i. e.*, it would cover emergencies in AFDC families arising out of the actual or threatened loss of shelter due to damage or eviction and the immediate needs of presumptively eligible AFDC applicants.

of EA as an altogether "new" program that would provide federal matching for emergency assistance "[f]or the first time," 113 Cong. Rec. 36319 (1967) (remarks of Sen. Curtis). But, as we have already observed, a critical distinction between EA and AFDC is that eligibility for the former does not depend on the absence of a parent from the home. Thus the enactment of EA extended aid to an entirely new class of families that had not previously been eligible for any form of federal assistance.[9] In this context, the fact that EA was described as a "new" program hardly implies an understanding that the emergency needs of persons who *were* eligible for AFDC could not be met under the existing program.[10] Indeed the contrary understanding is revealed in the observation that emergency assistance to AFDC applicants was *"frequently . . .* unavailable under State programs today." S. Rep. No. 744, 90th Cong., 1st Sess., 165 (1967). (Emphasis supplied.)

There is nothing, therefore, in the policies or history of the EA statute to indicate that Illinois' proposed AFDC special-needs program should not be judged solely under the requirements for an AFDC program funded under § 403 (a)(1), without regard to the EA requirements of §§ 406 (e) and 403 (a)(5). Accordingly, we must consider whether the special-needs program proposed by Illinois is permissible as part of an AFDC program alone.

---

[9] "For the first time, the Federal Government will match money for emergency assistance. This has not been in the law before. For a period of 30 days, *emergency assistance can be paid in cases where they cannot meet other qualifications."* 113 Cong. Rec. 36319 (1967) (remarks of Sen. Curtis). (Emphasis supplied.) See also S. Rep. No. 744, 90th Cong., 1st Sess., 166 (1967).

[10] Even if their import were clearer, as an expression of Congress' understanding as to the scope of the pre-existing AFDC statute, such *post hoc* observations by a single member of Congress carry little if any weight. See *Los Angeles Dept. of Water & Power* v. *Manhart,* 435 U. S. 702, 714.

## B

Illinois' proposed program would recognize specified emergency needs as "special needs items" within its AFDC "standard of need." The standard of need is a dollar figure set by each State reflecting the amount deemed necessary to provide for essential needs, such as food, clothing, and shelter.[11] See *Rosado* v. *Wyman,* 397 U. S. 397, 408. It is the "yardstick" for measuring finanical eligibility for assistance, but the level of benefits actually paid is not necessarily a function of the standard of need. *Ibid.* At least as early as 1966 federal regulations recognized that States could properly include special-needs items in their standards of need for AFDC.[12] These "are usually defined as those needs that are recognized by the State as essential for some persons but not for all, and that must therefore be determined on an individual basis." U. S. Dept. of HEW, Social and Rehabilitation Service, Assistance Payments Administration, Characteristics of State Plans for Aid to Families with Dependent Children xiii (1974) (AFDC Survey). Whenever the special need is found to exist, it is budgeted in the total standard of need. *Ibid.*

Frequently the special need is a regular or recurring expense, such as medication or a medically indicated diet, but this is not always the case. On the contrary, the 1974 AFDC Survey, *supra,* reveals that HEW has approved state plans that cover a wide variety of needs under the rubric of "special circumstance items," including one-time emergency needs like

---

[11] The States have a "great deal of discretion" in setting the standard of need, and "some States include in their 'standard of need' items that others do not take into account." *Rosado* v. *Wyman,* 397 U. S. 397, 408.

[12] U. S. Dept. of HEW, Handbook of Public Assistance Administration, Part IV, § 3131 (3) (1966). Current regulations provide that "[i]f the State agency includes special need items in its standard [the state plan must] (*a*) describe those that will be recognized, and the circumstances under which they will be included, and (*b*) provide that they will be considered in the need determination for all applicants and recipients requiring them." 45 CFR § 233.20 (a)(2)(v) (1977).

replacing major appliances,[13] home repair,[14] and catastrophic loss.[15] Similarly, the loss of shelter because of damage or eviction is a particular, nonrecurring event that befalls some, but not all, AFDC recipients, which may be reflected in an adjustment in the standard of need whenever that event occurs.

By approving state plans that cover nonrecurring emergencies as special needs HEW has expressed its view that such items are properly included in the AFDC standard of need for reimbursement under § 403 (a)(1). The interpretation of the agency charged with administration of the statute is, of course, entitled to substantial deference. *New York Dept. of Social Services* v. *Dublino,* 413 U. S. 405, 421. Moreover, this view is entirely consistent with the well-established principle that the States have "undisputed power to set the level of benefits and the standard of need" for their AFDC programs. *King* v. *Smith,* 392 U. S., at 334; *Dandridge* v. *Williams,* 397 U. S. 471, 478; *Rosado* v. *Wyman, supra,* at 408; *Jefferson* v. *Hackney,* 406 U. S. 535, 541. See n. 11, *supra.*

Since Illinois has not in fact submitted a proposed special-needs program for approval, see n. 8, *supra,* there is no way of knowing whether such a plan would comply in all other respects with the requirements for an AFDC program. But it is clear that a plan to meet certain emergency needs of AFDC recipients—specifically actual or threatened loss of shelter due to damage or eviction—is not necessarily improper as an AFDC special-needs program simply because it addresses a

---

[13] Illinois and Minnesota. AFDC Survey 59, 100.

[14] Arizona, Connecticut, Guam, Iowa, Kansas, Minnesota, New Hampshire, and South Dakota. *Id.,* at 11, 27, 46, 69, 73, 100, 125, 179.

[15] California's plan provided for "replacement of clothing and certain household items because of sudden or unusual circumstances beyond [the] control of [the] family." *Id.,* at 19. Connecticut, North Dakota, and Rhode Island covered needs arising out of "catastrophic" events as special-circumstance items. *Id.,* at 27, 147, 171.

nonrecurring need that could alternatively be provided for under an EA program.

## III

Although the Court of Appeals' opinion in *Mandley II* focused on the proposed special-needs program, the injunction it ordered to be entered on remand would prohibit not only the operation of such a program under AFDC, but *any* program of emergency assistance that defines eligibility more narrowly than § 406 (e). In substance, therefore, the injunction would enforce *Mandley I*'s holding that § 406 (e) imposes mandatory eligibility standards on States participating in the EA program. Since there is still a live controversy over this issue, see n. 7, *supra,* it is to that question that we now turn.

Section 406 (e) defines EA in terms of four distinct considerations. First, unlike AFDC, it specifies a time limitation: EA may be provided only for a period not to exceed 30 days in any 12-month period. Second, it describes the persons on whose behalf aid may be furnished: needy children under the age of 21 who are living with specified relatives. Third, it defines the circumstances under which aid may be provided: where the child is without resources, and aid is necessary to "avoid destitution . . . or to provide living arrangements" for the child. Finally, it describes the method by which aid may be provided: not only cash payments and medical or remedial care, as under AFDC, but also payments in kind and "such services as may be specified by the Secretary." In summary, under EA any family with children that is for any reason threatened with destitution is eligible for emergency aid at least once in a 12-month period, and that aid may be provided by almost any means.

In declaring that Illinois is prohibited from narrowing these broad standards in any way,[16] the Court of Appeals relied on

---

[16] The original plan actually invalidated in *Mandley I* narrowed EA eligibility by limiting it to persons also eligible (or presumptively eligible) for AFDC, and by recognizing as circumstances of emergency need only

a long line of this Court's cases mapping out the mandatory reach of the AFDC eligibility provisions. As to AFDC, the law is indeed clear. Each State is entirely free to set its own monetary standard of need and level of benefits. *King* v. *Smith, supra,* at 334; *Dandridge* v. *Williams, supra,* at 478; *Rosado* v. *Wyman,* 397 U. S., at 408; *Jefferson* v. *Hackney, supra,* at 541.[17] But the States are not free to narrow the federal standards that define the categories of people eligible for aid. Beginning with *King* v. *Smith, supra,* this Court has consistently held that States participating in the AFDC program must make assistance available to *all* persons who meet the criteria of § 406 (a) of the Act. *Carleson* v. *Remillard,* 406 U. S. 598; *Townsend* v. *Swank,* 404 U. S. 282. See also *Lewis* v. *Martin,* 397 U. S. 552. The statutory foundation for this conclusion is § 402 (a) (10), which requires that a State's "plan for aid and services to needy families with children" must provide that "aid to families with dependent children shall be furnished with reasonable promptness to all eligible individuals." 42 U. S. C. § 602 (a) (10).

---

an AFDC recipient's loss of shelter due to damage or eviction, and an AFDC applicant's immediate need for household effects. Other States, however, have imposed different kinds of restrictions on EA eligibility. Some, for example, *exclude* AFDC recipients if the emergency need is one theoretically covered by the basic assistance grant, reasoning that the State should not pay double benefits when recipients have failed to budget their resources properly. See generally Note, Meeting Short-Term Needs of Poor Families: Emergency Assistance for Needy Families with Children, 60 Cornell L. Rev. 879, 888–892 (1975).

The injunction ordered by the Court of Appeals in *Mandley II* apparently reaches all such limitations. It requires Illinois, so long as it receives any funds under Title IV–A and operates an emergency aid program, to provide assistance to all persons who fit the federal description of eligible individuals, and it prohibits HEW from "approving state plans for emergency assistance which limit eligibility more narrowly than § 406 (e)."

[17] By controlling these two elements, which determine actual payments under the program, every State retains the ability to control its total AFDC expenditures. Cf. *Jefferson* v. *Hackney,* 406 U. S., at 539–541.

The question to be decided is whether these interpretive principles are to be applied to the EA program as well.

## A

The short answer is that, since § 402 (a)(10) on its face applies only to "aid to families with dependent children" and not to the separately designated program of "emergency aid to needy families with children," it cannot be the basis for making the § 406 (e) eligibility requirements mandatory on the States.

The Court of Appeals recognized that § 402 (a)(10) was limited by its language to AFDC, but nevertheless concluded that Congress intended to treat EA "in the same way" because it is "part of the same statutory scheme," and rooted in the "same Congressional concern with [the] deprivation of children that brought forth the AFDC program . . . ." *Mandley I,* 523 F. 2d, at 422. But Congress' choice of precise language in this complex statute cannot be glossed over with such generalities.

The § 402 "state plan for aid and services to needy families with children" is the central, organizing element of the Title IV–A program. A State's plan establishes both its funding relationship with the Federal Government and the substantive terms of all Title IV–A programs in which it has elected to participate. Thus, the plan reflects not only the basic AFDC program of cash assistance defined in § 406 (b), but also Title XX social services, see § 402 (a)(15) and 42 U. S. C. § 1397 *et seq.* (1970 ed., Supp. V), and, if the State chooses to adopt them, the optional programs of EA, defined in § 406 (e), and AFDC–Unemployed Fathers (AFDC–UF), established by § 407.

Section 402 (a) lists some 20 specific requirements for which a state plan "must provide." Some clearly apply to the plan as a whole. These generally concern program administration. *E. g.,* § 402 (a)(1) ("provide that it shall be in effect in all

political subdivisions of the State"); § 402 (a) (5) ("provide . . . such methods of administration . . . as are found by the Secretary to be necessary [and] proper . . ."); § 402 (a) (9) ("provide safeguards which restrict the use or disclosure of information concerning applicants or recipients . . ."). Others, like § 402 (a) (10), refer specifically to "aid to families with dependent children." *E. g.,* § 402 (a) (7) ("provide that the State agency shall, in determining need, take into consideration any other income and resources of any child or relative claiming aid to families with dependent children"); § 402 (a) (11) ("provide for prompt notice . . . to the State child support collection agency . . . of the furnishing of aid to families with dependent children with respect to a child who has been deserted or abandoned . . .").

The term "aid to families with dependent children" is given a very specific meaning in § 406 (b)—and "emergency assistance to needy families with children" as defined in § 406 (e) means, as we have observed, something quite different. It is true that both the EA and AFDC programs must be reflected in a State's § 402 plan, and both will be governed by those parts of § 402 that apply to the plan as a whole. But there is no basis for assuming that, when § 402 refers specifically to AFDC, those references are either meaningless or inadvertent. On the contrary, there is every reason to suppose that the exclusion of EA from specific substantive requirements of § 402, in particular § 402 (a) (10)'s imposition of mandatory eligibility standards, was deliberate, since the absence of mandatory eligibility standards is wholly consistent with the nature and purpose of the EA program.

## B

The EA program was adopted by means of an amendment to § 406 defining the new term "emergency assistance to needy families with children." Pub. L. 90–248, § 206 (b), 81 Stat. 893. But nowhere in the EA statute is there a

precise definition of eligibility comparable to the terms that have been held mandatory in AFDC. As to the latter, the term "aid to families with dependent children" is defined in § 406 (b) as "money payments . . . in behalf of [a] dependent child . . . ." The term "dependent child" is separately defined in § 406 (a) as a needy child who has been deprived of parental support, is living with specified relatives, and is either under the age of 18 or under the age of 21 and regularly attending school. It is this very specific definition of "dependent child" in § 406 (a) that has been held to be mandatory upon the States in *King* v. *Smith,* 392 U. S. 309 ("deprived of parental support"), *Carleson* v. *Remillard,* 406 U. S. 598 ("continued absence from the home"), and *Townsend* v. *Swank,* 404 U. S. 282 ("regularly attending a school").

On the other hand, the term "emergency assistance to needy families with children" is defined in § 406 (e) as payments and services furnished "in the case of a needy child" who meets certain requirements and is facing destitution. The structure of this statutory provision thus parallels § 406 (b)—*i. e.,* while it describes eligible persons, it is in terms a definition of the *program* for which federal funding is available. But in the EA program there is no separate provision, parallel to § 406 (a), that defines the terms used to describe eligible persons.[18] There is no statutory language, therefore, that can reasonably be understood as imposing uniform standards of eligibility on every state EA program.[19]

---

[18] By contrast, the other optional Title IV–A program, AFDC–UF, is defined by reference to the key statutory term "dependent child." § 407 (a), 42 U. S. C. § 607 (a). This indicates that when Congress intended that a separate program should be treated "in the same way" as AFDC, it was able to express that intent clearly by actually incorporating the identical terms.

[19] The Court of Appeals thought that "the problem of setting workable definitions for the somewhat amorphous eligibility criteria in [§ 406 (e) could] be addressed by HEW rule-making," *Mandley I,* 523 F. 2d, at 422–423, and indeed required such rulemaking in its *Mandley II* order. See

The conclusion that Congress in fact intended to treat EA and AFDC quite differently is fully consistent with its purposes in enacting the EA program. Unlike the basic AFDC program and the optional AFDC–UF extension, EA is not a comprehensive system of income maintenance, but rather a program designed to allow quick, ad hoc responses to immediate needs. Indeed one of the primary purposes of making EA available to persons not receiving or eligible for AFDC was to "encourag[e] the States to move quickly in family crises, supplying the family promptly with appropriate services," in the hope that this "would in many cases preclude the necessity for the family having to go on [AFDC] assistance on a more or less permanent basis." 113 Cong. Rec. 23054 (1967) (remarks of Cong. Mills). This purpose reflects not only an awareness of the distinct difference between AFDC and EA, but also an understanding that EA would not be surrounded with all of the trappings that § 402 requires of the ongoing AFDC cash-payments program. In short, EA was designed "to assure needed care for children, to focus maximum effort on self-support by families, and to provide *more flexible and appropriate tools to accomplish these objectives.*" S. Rep. No. 744, 90th Cong., 1st Sess., 165 (1967). (Emphasis supplied.)

---

n. 5, *supra.* The statute does not, however, require the Secretary to promulgate implementing regulations to clarify the scope of § 406 (e). Compare § 406 (e) with § 407 (a) (AFDC–UF). Cf. *Batterton* v. *Francis,* 432 U. S. 416. And the regulations in fact adopted by the Secretary interpret the statute as leaving the States with broad discretion as to EA eligibility requirements. 45 CFR § 233.120 (1977). The Secretary's contemporaneous interpretation of the statute is entitled to considerable deference. *New York Dept. of Social Services* v. *Dublino,* 413 U. S. 405, 421. In the absence of an express delegation of authority to the Secretary, there is simply no basis for assuming that Congress intended that he, rather than the States, must make definite—and mandatory—the generalized standards of eligibility it wrote into the EA statute. Cf. n. 21, *infra.*

As a matter of historical fact, Congress has always left the States broad discretion in shaping the programs that, like EA, authorize assistance to persons not eligible for AFDC in the hope of preventing lasting welfare dependency. Under the former § 406 (d) family services program [20] the States had "considerable latitude in providing services to nonwelfare recipients on the grounds that they [were] 'former or potential' recipients." S. Rep. No. 93–1356, p. 9 (1974). And the declared purpose of the new Title XX social services program enacted in 1975, 42 U. S. C. § 1397 *et seq.* (1970 ed., Supp. V), was to "encourag[e] each State, *as far as practicable under the conditions in that State,* to furnish services directed at the goal of . . . achieving or maintaining economic self-support to prevent, reduce, or eliminate dependency. . . ." 42 U. S. C. § 1397 (1970 ed., Supp. V). (Emphasis supplied.) The legislative history of that statutory program reflects Congress' awareness that the very magnitude of its purpose would require that "the States . . . have the ultimate decision-making authority in fashioning their own social service programs within the limits of funding established by Congress." S. Rep. No. 93–1356, *supra,* at 6.[21]

By the same token, the very breadth of the potential reach of EA—to virtually any family with needy children of a

[20] Section 406 (d) of the Act, as set forth in 42 U. S.C. § 606 (d), defined "family services" as "services to a family or any member thereof for the purpose of preserving, rehabilitating, reuniting, or strengthening the family, and such other services as will assist members of a family to attain or retain capability for the maximum self-support and personal independence." Section 406 (d) has been repealed and replaced by the new Title XX Social Services program. Pub. L. 93–647, §§ 2, 3 (a)(5), 88 Stat. 2337, 2348. See 42 U. S. C. § 1397 *et seq.* (1970 ed., Supp. V).

[21] This conclusion was based on the "lengthy history of legislative and regulatory action in the social service area [which] made it clear . . . that the Department of Health, Education, and Welfare can neither mandate meaningful programs nor impose effective controls upon the States." S. Rep. No. 93–1356, at 6.

certain age that faces a risk of destitution—argues against the inference that Congress intended to require participating States to extend aid to *all* who were potentially eligible under § 406 (e). A literal application of all of the § 406 (e) standards, as required by the Court of Appeals' proposed order, would create an entirely open-ended program, not susceptible of meaningful fiscal or programmatic control by the States.

The Court of Appeals believed that under its interpretation of the Act Illinois would retain "substantial control" of its program through its ability to limit the amount of assistance actually paid:

> "It will be able to choose the level of benefits that it will provide and to set the standard of need. It may reasonably limit the amounts paid out in emergency assistance, *Dandridge* v. *Williams*, 397 U. S. 471, . . . but it will not be able to declare ineligible those who come within the federal definition of eligibility in [§ 406 (e)]. . . . This need not result in additional expense to the state but with existing appropriations should at least result in helping a broader number of persons, although more moderately than at present." *Mandley I*, 523 F. 2d, at 422–423.

But this application of the distinction drawn in the AFDC cases between eligibility criteria and financial need standards, see *supra*, at 740, fundamentally misconceives the purpose of the EA program. A family that is facing destitution because its home has burned down is not helped at all by a "moderate" grant insufficient to see it through the crisis. As the Illinois Director of the Department of Public Aid stated in his report to the Legislative Advisory Committee on Public Aid, the decision in *Mandley I* created an untenable tension between fiscal and programmatic integrity in the EA system:

> "But even if the Department could so limit [expenditures as suggested by the Court of Appeals] the results would be to divide a limited amount of Emergency Assistance

money among a very expanded group of individuals, thus reducing the amount of assistance paid in each individual case to a meaninglessly small amount. The agency is thus faced with the prospect, if it continues the program, of potentially unlimited financial expenses, if it meets actual need in Emergency Assistance payments, or the payment of meaninglessly small amounts (and the possibility of legal challenge and subsequent mandatory order of additional financial payments)."

The intent of Congress in enacting EA thus would not be furthered by a statutory interpretation that requires a State to meet less than what it believes is the actual emergency need of an eligible family in order to retain financial control of its program. On the other hand, that intent will be effectuated by the natural reading we give to the relevant statutory provisions. Neither § 402 (a)(10), which makes *AFDC* eligibility criteria mandatory, nor § 406 (e), which defines the *permissible* scope of an EA program for purposes of federal funding, imposes mandatory eligibility standards on States that elect to participate in the EA program.

For the foregoing reasons the judgment of the Court of Appeals is reversed, and the cases are remanded for further proceedings consistent with this opinion.[22]

*It is so ordered.*

MR. JUSTICE BLACKMUN took no part in the consideration or decision of these cases.

---

[22] The Court of Appeals did not reach the respondents' constitutional and state-law claims, see n. 3, *supra*. They remain open for consideration on remand.