Maria Angelina F. ANGCO et al., Plaintiffs,

v.

Alexander M. HAIG, Secretary of State, Defendant.

Civ. A. No. 79–4636.

United States District Court, E. D. Pennsylvania.

May 29, 1981.

---

Richard D. Steel, Wasserman, Orlow, Ginsberg & Rubin, Philadelphia, Pa., for plaintiffs.

Alexander Ewing, Jr., Asst. U. S. Atty., Peter F. Vaira, U. S. Atty., Philadelphia, Pa., Bruce G. Bellin, Dept. of Justice, Washington, D. C., for defendant.

## OPINION

DITTER, District Judge.

In this action, I am called upon to construe "a unique and obscure provision"[1] of the Immigration and Nationality Act Amendments of 1976 ("the 1976 amendments"). Section 202(e) of the 1976 amendments alters the manner in which citizens of a foreign country are admitted to the United States as permanent residents. The change occurs with respect to a particular foreign nation whenever the maximum number of immigrant visas have been made available to its natives during the preceding fiscal year. The plaintiffs, all third and sixth preference applicants from the Philippines, were denied permanent residency status during fiscal year 1980 because the Philippines' annual quota of visas was issued to applicants in higher preference categories. Plaintiffs filed the instant action for declaratory and injunctive relief against the Secretary of State[2] alleging that the Department of State's refusal to apply section 202(e) to Philippine immigration in 1980 was premised upon an erroneous interpretation of the statute. The parties have filed cross-motions for summary judgment each advancing a different construction of this provision.[3] After careful consideration of

1. 1 C. Gordon and H. Rosenfield, Immigration Law and Procedure § 2.28c (rev. ed. 1980).

2. By virtue of 8 U.S.C. § 1104(a), the Secretary of State is statutorily charged with the responsibility of administering and enforcing the provisions of the Immigration and Nationality Act.

3. In addition to the motion for summary judgment, defendant has filed a motion to dismiss for failure to join indispensable parties under Fed.R.Civ.P. 19. In a nutshell, he argues that a ruling favorable to plaintiffs would impair the interests of first and second preference appli-

cants by effectively reducing the number of visas available to them. It is therefore contended that these applicants are indispensable parties and, because such a broad category of prospective litigants cannot feasibly be brought into this action, I am urged to dismiss the suit with leave to refile as a class action. Defendant asserts that complete relief can only be afforded if I certify two subclasses—those prospective immigrants who are benefitted by the Department of State's interpretation of section 202(e) and those who are harmed by it. I

the pleadings, briefs, and discovery on record, I have concluded that the Department of State's position is consistent with the express terms of the statute, with its legislative history, and with the purposes prompting its enactment by Congress in 1976. I will therefore grant summary judgment in favor of the defendant.

In order to consider adequately the issues raised in this case, the statutory scheme governing the distribution and allocation of visas must be examined in some detail. In fiscal year 1979, the total number of visas which could have been distributed worldwide was 290,000. 8 U.S.C. § 1151(a).[4] The maximum number of visas which may be allocated to the natives of a single foreign state in each fiscal year is 20,000. 8 U.S.C. § 1152(a). The way these visas are to be distributed within a single foreign state is governed by 8 U.S.C. § 1153(a) which sets forth eight preference categories in a descending order of priority. Each preference category is based upon some familial relationship to United States citizens or permanent residents, professional skills, or refugee status, and each is allotted a specified percentage of the worldwide quota of 290,000.[5] As a result, if a particular nation has

---

decline to take such an approach. Although this action was commenced during fiscal year 1980, the year ended on October 1, 1980. Therefore, a ruling in favor of plaintiffs would have no effect on 1980 immigration except to provide plaintiffs with the visas requested. See note 13, *infra*. To the extent that the ruling would prospectively affect the application of section 202(e) in future fiscal years when traditionally oversubscribed countries do not reach their statutory maximum of 20,000 visas, the category of prospective applicants harmed by such a ruling is simply too uncertain and too amorphous to be considered as indispensable under Fed.R.Civ.P. 19 or subjected to class treatment under Fed.R.Civ.P. 23. I note in addition that to the extent that the interests of future first and second preference visa applicants might be impaired by an adverse ruling here, those interests are fully protected by the Department of State which advances an interpretation of section 202(e) directly favorable to such future applicants. Cf. *Commonwealth of Pennsylvania v. Rizzo*, 530 F.2d 501, 505 (3d Cir.), *cert. denied*, 426 U.S. 921, 96 S.Ct. 2628, 49 L.Ed.2d 375 (1976) ("[w]here official policies and practices are challenged, it seems unlikely that anyone could be better situated to defend them than the governmental department involved and its officers").

4. Prior to the enactment of the 1976 amendments, the issuance and distribution of visas was governed by the Act of October 3, 1965, Pub.L. 89–236, 79 Stat. 911 (1965), which amended the original Immigration and Nationality Act of 1952, 8 U.S.C. § 1101 *et seq.* Under the 1965 amendments, immigration from the Eastern Hemisphere was subject to a quota of 170,000 visas per fiscal year with a 20,000 per country limit. Pub.L. 89–236, §§ 1(a), 2(a), 79 Stat. 911–12. The distribution of visas within each country was governed by an eight category preference system premised upon familial ties and employment skills. Each preference category was entitled to a specified percentage of the annual hemispheric maximum of 170,000. *Id.* § 3, 79 Stat. 912–13. By contrast, Western Hemisphere immigration was limited only by an annual quota of 120,000. *Id.* § 21(e), 79 Stat. 921. Otherwise, it operated on a first come, first served basis with no per country limit or system for visa allocation.

Recognizing that this system "resulted in numerous and . . . unnecessary hardships for potential Western Hemisphere immigrants" 122 Cong.Rec. 33633 (1976) (remarks of Rep. Eilberg), Congress passed the 1976 amendments which imposed the 20,000 per country limit and system of preference categories upon countries in the Western Hemisphere as well. Pub.L. 94–571, § 2, 90 Stat. 2703. In 1978, the dichotomy between Eastern and Western Hemisphere immigration was abolished entirely and an annual worldwide quota of 290,000 was established. Act of October 5, 1978, Pub.L. 95–412, § 1, 92 Stat. 907 (1978).

After this suit was instituted, Congress once again amended the Act. The worldwide quota was lowered to 280,000 for fiscal year 1980 and 270,000 for fiscal year 1981. *See* Refugee Act of 1980, Pub.L. 96–212 §§ 203(a), 204(b)(3), 94 Stat. 106–07, 109 (1980). In addition, the proportionate allocations of 8 U.S.C. § 1153(a) and 8 U.S.C. § 1152(e) were amended in several particulars which were made retroactive to the commencement of fiscal year 1980. *Id.* § 203(b) and (c), 94 Stat. 107. Because the pattern of visa distributions which gave rise to this action occurred during fiscal year 1979, I will consider the worldwide quota to be 290,000 for purposes of this opinion. In addition, since this suit was brought before the 1980 amendments were enacted and because the amendments do not affect the legal issue presented, I will consider the preference system as it existed prior to the amendments with the changes noted as appropriate.

5. The specific preference categories and their respective percentage of the worldwide quota as set forth in 8 U.S.C. § 1153(a)(1)–(8) may be paraphrased as follows:

a heavy visa demand in the higher preference categories its entire annual allotment of 20,000 visas will be filled almost exclusively from the high preference classifications and applicants in the lower preference categories will be precluded from having a realistic opportunity to obtain visas. This necessarily results in a large number of unfilled visa applications in the lower preference categories.

In order to alleviate this situation, Congress enacted section 202(e) of the Immigration and Nationality Act Amendments of 1976, Pub.L. 94–571, § 3(3), 90 Stat. 2704 (1976) *codified at* 8 U.S.C. § 1152(e) which provides in pertinent part:

Whenever the maximum number of visas ... have been made available under section 202 to natives of any single foreign state ... in any fiscal year, in the next following fiscal year a number of visas ... not to exceed 20,000 ... shall be made available and allocated as follows ....[6]

(1) Unmarried sons and daughters of United States citizens—20 per cent;

(2) Spouses and unmarried sons and daughters of aliens lawfully admitted for permanent residence—20 per cent plus any unused visas from category 1;

(3) Members of the professions or those "who because of their exceptional ability in the sciences or the arts will substantially benefit prospectively the national economy, cultural interests or welfare of the United States."—10 per cent.

(4) Married sons or daughters of United States citizens—10 per cent plus any unused visas from categories (1)–(3).

(5) Brothers or sisters of United States citizens over 21 years old—24 per cent plus any unused visas from categories (1)–(4).

(6) Immigrants capable of performing specified skilled or unskilled labor "for which a shortage of employable and willing persons exist in the United States"—10 per cent.

(7) Conditional entries made available to refugees by the Attorney General—6 per cent.

(8) Non preference—visas left over from categories (1)–(7).

These were the preference categories applicable to visa applications during fiscal year 1979. As indicated in note 3, *supra*, they were amended in 1980. The percentage of visas allotted to second category applicants was increased to 26 percent and category seven was eliminated en-

Section 202(e) then provides that the distribution of visas shall be made in accordance with a series of seven preference categories which substantially comport with those set forth in 8 U.S.C. § 1153(a)(1)–(7).[7] Each preference category is entitled to a specified percentage of that country's annual allotment of 20,000 visas. The express purpose of this amendment "is to insure a fairer distribution of visas under the preference system for those countries whose overall visa demand regularly exceeds the number available or of those with a particularly high demand for visas under a specific preference category." H.R.Rep.No.94–1553, 94th Cong., 2d Sess. 10, *reprinted in* [1976] U.S.Code Cong. & Ad.News 6073, 6082. This objective is accomplished by predicating the proportionate distribution of visas to each preference category upon that country's allotment of 20,000 visas rather than the worldwide total of 290,000.

The consequences of distributing visas in accordance with section 202(e) as opposed to 8 U.S.C. § 1153(a) can be demonstrated by utilizing a concrete, albeit simplistic, illus-

tirely. *See* Refugee Act of 1980, Pub.L. 96–212, § 203(c), 94 Stat. 107 (1980).

**6.** The provision cited in the text is that found in the Statutes at Large. It differs slightly from *the version found in the United States Code* which states that the section controls visa distribution "whenever the maximum number of visas ... have been made available *under this section* ...." I note that Title 8 of the United States Code has not been enacted into positive law. *See* 1 U.S.C. § 204(a) (Supp.1981). Thus, *codification of the Immigration and Nationality Act is only prima facie evidence of the law* and since there is a conflict between the Statutes at Large and the United States Code, the Statutes at Large must prevail. *United States v. Welden*, 377 U.S. 95, 98 n. 4, 84 S.Ct. 1082, 1085 n. 4, 12 L.Ed.2d 152 (1964); *Stephan v. United States*, 319 U.S. 423, 426, 63 S.Ct. 1135, 1137, 87 L.Ed. 1490 (1943); *Abell v. United States*, 518 F.2d 1369, 1376–77 (Ct.Cl.1975), *cert. denied*, 429 U.S. 817, 97 S.Ct. 59, 50 L.Ed.2d 76 (1976). In any event, it is clear that despite this minor discrepancy, the substantive import of these two versions is identical.

**7.** In 1980, section 202(e) was amended to conform to the changes made in 8 U.S.C. § 1153(a) mentioned in note 5, *supra*. *See* Refugee Act of 1980, Pub.L. 96–212, § 203(b), 94 Stat. 107 (1980).

tration. Under the latter provision, applicants from the first preference category are entitled to 20 per cent of the worldwide annual quota of 290,000 or a total of 58,000 visas per fiscal year. Thus, first preference visa applicants from a foreign state have priority over lower preference applicants from that state until either the country's annual quota of 20,000 is met or until the worldwide first preference category ceiling of 58,000 is reached. In a country with a sufficiently strong demand by qualified, first preference visa applicants, the lion's share of that country's annual allotment of 20,000 visas will be distributed to first preference immigrants before the worldwide ceiling of 58,000 first preference visas are issued. Similarly, if second preference demand is also high in that country, the remainder of its 20,000 visas will be distributed to second preference applicants before the worldwide quota of 58,000 second preference visas is met. This serves to illustrate the practical consequence of distributing visas under 8 U.S.C. § 1153(a) in a country with a heavy demand in the top preference categories—its annual allotment of visas is exhausted by applicants in the higher preference classifications thus precluding applicants in the lower preference categories from obtaining visas.

By contrast, if visa distribution is made pursuant to section 202(e), the proportionate allocation of visas to the various preference categories is predicated upon the country's annual allotment and not the worldwide quota. If 20,000 immigrants are admitted, first preference applicants are entitled to 20 per cent of that amount or 4,000 visas. Second preference applicants are

also entitled to 4,000 (20 per cent) plus any unused first preference visas; third preference applicants receive 2,000 visas (10 per cent); fourth preference 2,000 (10 per cent) etc. In this manner, the application of section 202(e) assures the continued availability of visas to lower preference applicants in countries with high levels of demand in the higher preference categories.

Distribution of visas under the terms of section 202(e) in a fiscal year occurs only when, in the preceding fiscal year, "the maximum number of visas ... have been made available under section 202 to natives of any single foreign state." Defendant, relying upon the construction of this provision adopted by the Department of State and the Immigration and Naturalization Service (INS) [8] argues that the term "maximum number of visas ... made available under section 202 ...." refers to a foreign state's maximum annual allotment of 20,000 visas. Thus, whenever the statutory maximum of 20,000 visas is made available to the natives of a single foreign state, the distribution of visas in that country during the following fiscal year will be governed by section 202(e). In fiscal years 1977 and 1978,[9] the maximum number of 20,000 visas was made available to natives of the Philippines and, accordingly, the distribution of visas during fiscal years 1978 and 1979 was made under section 202(e). However, in fiscal year 1979, only 17,874 visas were made available to Filipino natives and, pursuant to the Department of State's interpretation of seciton 202(e), distribution of visas in fiscal year 1980 was made under the general provisions of 8 U.S.C. § 1153(a).[10]

8. The Department of State's interpretation was set forth in a March, 1979, letter from the assistant secretary of consular affairs to all consular posts which advised them that because of a change in immigration patterns during fiscal year 1979, section 202(e) would not be applicable to immigration from several over-subscribed countries. INS' interpretation was published in the Federal Register on December 30, 1976, shortly after the passage of the legislation and its approval by the President. *See* 41 Fed.Reg. 56,870 (1976).

9. The 1976 amendments went into effect on January 1, 1977 or after one quarter of fiscal year 1977 had elapsed.

10. There is a partial disagreement between the parties as to the reasons that the full 20,000 quota was not available to the Philippines in fiscal year 1979. Both agree that the principal reason for the shortfall was that the worldwide demand for visas was in excess of the 290,000 quota thus leaving no non-preference numbers available pursuant to 8 U.S.C. § 1153(a)(8). Consequently, the worldwide quota was met before the Philippines, and vari-

The plaintiffs, all from the Philippines, are third and sixth preference visa applicants. They presently reside in this country under temporary visas and are employed as registered nurses pursuant to alien labor certifications approved by the Department of Labor. Each plaintiff filed a preference petition for fiscal year 1980 and was given a priority date in accordance with 8 U.S.C. § 1153(c) and 8 C.F.R. § 204.1(c)(2).[11] However, because the distribution of visas in fiscal year 1980 was made under 8 U.S.C. § 1153(a), it became apparent that only the top two preference categories would receive visas and plaintiffs would be unable to obtain adjustments of status to permanent residents. They then commenced this action seeking, *inter alia*, a declaration that defendant's interpretation of section 202(e) is erroneous.[12] They contend that the distribution of visas under section 202(e) is triggered whenever the demand for visas in a given country exceeds the number that can be made available in a fiscal year. Under plaintiffs' interpretation, section 202(e) should have controlled visa distribution in fiscal year 1980 because, although less than 20,000 visas were actually made available to the Philippines in 1979, the demand for

visas by Philippine natives was far in excess of that amount.

The issue thus presented for resolution is a fairly narrow one: Whether the Department of State's authority to invoke section 202(e) is contingent upon a foreign state's having the statutory maximum of 20,000 visas made available to it during the preceding fiscal year or whether it suffices for the demand for visas to be in excess of the number that can be made available. Before addressing this issue, it is necessary to delineate the standard to be used in evaluating the parties' respective contentions. It is well settled that the interpretation of a statute by the governmental agency statutorily charged with its administration is entitled to great deference. *Quern v. Mandley*, 436 U.S. 725, 738, 98 S.Ct. 2068, 2076, 56 L.Ed.2d 658 (1978); *Zemel v. Rusk*, 381 U.S. 1, 11, 85 S.Ct. 1271, 1278, 14 L.Ed.2d 179 (1965). I am therefore required to sustain the defendant's interpretation of this statute "if it is reasonable and not contrary to the discernable intent of Congress, even if it is not the only reasonable interpretation . . . ." *Nazareno v. At-*

ous other oversubscribed nations had reached their individual allotment of 20,000. The plaintiffs also contend that the Philippines could not utilize seventh preference visas under 8 U.S.C. § 1153(a)(7) since it is not a communist or communist dominated country, within the general area of the Middle East, or the scene of a catastrophic event. Defendant disputes this analysis, claiming that any person fleeing a communist or communist controlled country who was a Philippine native would be entitled to a seventh preference visa. In any event, it is undisputed that less than 20,000 visas were made available to Philippine natives in fiscal year 1979 despite the fact that actual demand for visas was far in excess of that amount.

**11.** The mechanics of obtaining a visa work roughly in the following manner. An alien who wishes to be accorded a preference status must first apply for a preference classification, 8 U.S.C. § 1154(a), and establish to the satisfaction of the INS that he meets the qualifications for that particular classification. 8 U.S.C. § 1153(d). If an alien seeks admission as a third, sixth, or non-preference immigrant he must obtain an alien labor certification from the Department of Labor which is issued upon a finding that an insufficient number of work-

ers in the United States are qualified to perform the job that the alien intends to perform. 8 U.S.C. § 1182(a)(14); 8 C.F.R. § 204.1(c)(2). Upon satisfaction of these conditions, the State Department grants the immigrant a "preference status," 8 U.S.C. § 1154(b). He is also given a priority date which is the date on which the immigrant's petition for preference status was filed. Where, as here, the immigrant is already residing in the United States, he may apply for an adjustment of status to permanent resident pursuant to 8 U.S.C. § 1255. Permanent visas are then issued by preference category and, within each preference category, chronologically on the basis of priority dates. *See* 8 U.S.C. § 1153(c); 22 C.F.R. § 42.63(a).

**12.** In addition to declaratory relief, the plaintiffs sought to enjoin defendant to preserve seven sixth preference visa numbers for the plaintiffs use in the event that they prevailed on the merits. *Motion for Preliminary Injunction* (Docket No. 3). Following the institution of this action, counsel for defendant advised the court that seven visa numbers would be made immediately available to the plaintiffs if the court ruled that they are entitled to receive visas. This, of course, obviated the need for a preliminary injunction.

*torney General,* 512 F.2d 936, 940 (D.C.Cir.), *cert. denied,* 423 U.S. 832, 96 S.Ct. 53, 46 L.Ed.2d 49 (1975). *See also DeAvilia v. Civiletti,* 643 F.2d 471, 475 (7th Cir. 1981) (Department of State interpretation of another provision of the 1976 amendments must be sustained "unless there are compelling indications that it is wrong."); *Castillo-Felix v. Immigration & Naturalization Service,* 601 F.2d 459, 465 (9th Cir. 1979). An examination of the plain terms of this provision, its rather sparse legislative history, and its underlying purposes convinces me that defendant's interpretation of section 202(e) is a reasonable construction of the words of the statute and is consistent with Congress' intent in enacting it.

It is axiomatic that "[t]he starting point in every case involving the construction of a statute is the language itself." *Southeastern Community College v. Davis,* 442 U.S. 397, 405, 99 S.Ct. 2361, 2366, 60 L.Ed.2d 980 (1979), quoting *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975) (Powell, J. concurring). Here, the statute in question was enacted as an amendment to section 202 of the Immigration and Nationality Act. It expressly provides that its terms control the issuance of visas "whenever the maximum number of visas ... have been made available *under section 202* to natives of any single foreign state ... in any fiscal year ..." 8 U.S.C. § 1152(e) (emphasis added). Section 202(a) of the Act, 8 U.S.C. § 1152(a), sets the maximum number of visas to be made available to natives of any single foreign state in any fiscal year as 20,000. Clearly, section 202(e) incorporates the statutory maximum of 20,000 set by section 202(a). The plaintiffs' assertion that if section 202(e) was meant to utilize the 20,000 maximum it would have specified 20,000 is strained and unconvincing. In the first place, the import of the statute is reasonably clear as drafted. While Congress' specification of 20,000 visas in section 202(e) might well have precluded *any* question as to the precise interpretation of the statute, I cannot say that its failure to do so renders its meaning significantly less clear or defendant's interpretation less tenable.

Further, the plaintiffs point to nothing in the statutory language supporting their proposed construction. I therefore conclude that the interpretation of section 202(e) adopted by the defendant is supported by the plain terms of the statute.

A review of the relevant legislative history confirms this analysis. The 1976 Amendments were passed by the House of Representatives on September 29, 1976. Immediately before their passage, Rep. Joshua Eilberg, chairman of the House Subcommittee on Immigration, Citizenship and International Law described the operation of section 202(e) to the full House in the following manner:

> [T]he bill would propose a formula which would provide that visas be distributed throughout the preference categories *in those cases where a country has reached its 20,000 limit for visa issuance.* This is designed to prevent one preference category from continuously utilizing a disproportionate share of visas by providing for the allocation of visas to all of the relative and labor preference categories in certain years. This distribution formula is extremely necessary if we are to insure that the goal of family reunification is achieved for all countries in the world.

122 Cong.Rec. 33633 (1976) (emphasis supplied). Congressman Eilberg's understanding of this provision is identical to that contained in the House Report recommending passage of the amendments:

> The section also adds a new Section 202(e) which provides that *whenever the maximum number of visas or conditional entries has been made available to natives of a foreign state (20,000)* or dependent area (600) in any fiscal year, in the following fiscal year visas or conditional entries will be made available and allocated to that foreign state or dependent area according to the priorities and percentages set forth in the preference system, as modified by this legislation.

H.R.Rep.No.94 1553, 94th Cong., 2d Sess. 14, *reprinted in* [1976] U.S.Code Cong. & Adm.News 6073, 6085-86 (emphasis sup-

plied).[13]  It is clear that although this issue did not generate extended discussion or debate,[14] it was generally intended by the Congress that enacted this legislation that the application of section 202(e) was to be predicated upon a country's reaching its statutory maximum of 20,000 visas.

As has been demonstrated, plaintiffs' contentions find little support in the language of section 202(e) or in its legislative history. The principal thrust of their argument, however, is that I should adopt their interpretation of this provision because it better furthers the objectives that the statute is designed to achieve.  Specifically, it is contended that, as occurred in fiscal year 1979, the actual number of visas which can be made available may be something less than 20,000 even though the demand for visas is significantly in excess of that amount. They argue that under these circumstances, defendant's construction of 202(e) serves to preclude those in the lower preference categories from obtaining visas even though, in terms of demand, the country is oversubscribed in the higher preference categories. Thus, by predicating the invocation of section 202(e) upon the availability of 20,000 visas, defendant ostensibly defeats that provision's purpose of assuring continued visa availability to those in the lower preference categories.  The plaintiffs assert that by premising the application of section 202(e)

upon demand rather than actual availability, the objectives of the statute are better furthered in that its application is not made contingent upon fluctuations in worldwide visa availability which may have little or nothing to do with visa demand in an oversubscribed country.

Even assuming that the plaintiffs' interpretation would provide a more flexible means of achieving section 202(e)'s objectives,[15] this would not permit me to adopt that construction of the statute as a matter of law.  As has been illustrated, the defendant's position is supported by the plain terms of the statute and by its legislative history.  Further, I cannot say that it is inconsistent with Congress' express desire to prevent the exhaustion of visa applications in the higher preference categories in those countries having a high demand for visas.  By tying the applicability of section 202(e) into a country's reaching its annual allotment of 20,000 visas, Congress sought to assure that the ameliorative provisions of that statute will normally control visa distribution in those countries most in need of them, i. e., those in which the number of visas annually made available reaches the statutory maximum.  For me to adopt the plaintiffs' proffered interpretation simply because it arguably better furthers these purposes would be tantamount to an

---

**13.**  The Senate passed the House version of these amendments on October 1, 1976, with little discussion or debate.  *See* 122 Cong.Rec. 34537 (1976).  There was no Senate Report submitted with the legislation.

**14.**  The plaintiffs argue that I should give no credence to the legislative record since there is no indication that the precise meaning of the statute was given extended or even cursory consideration by Congress.  I note parenthetically that the courts and commentators which considered this provision have, like Congress, summarily determined that it embodies the statutory maximum of 20,000 found in 8 U.S.C. § 1152(a).  *See Yang v. Immigration and Naturalization Service,* 574 F.2d 171, 172–73 n. 4 (3d Cir. 1978); 1 C. Gordon and H. Rosenfield, Immigration Law and Procedure § 2.28c (Rev. Ed.1980); Note, *The Immigration and Nationality Act Amendments of 1976: Implications for the Alien Professional,* 26 Cleve.State Law Rev. 295, 322 (1977).  I do not believe that this derogates in any way from the efficacy of de-

fendant's interpretation.  Indeed, it is more likely that the plain wording of the statute mandates this interpretation and, until the institution of this action, there was no real question raised as to section 202(e)'s meaning.

**15.**  Defendant disputes plaintiffs' contention that their interpretation of section 202(e) would better accomplish its objectives.  Basically, he responds by arguing that in countries such as the Philippines having a very high visa demand in the first several preference categories, the continuous annual application of section 202(e) would result in an enormous backlog of applications particularly in the second preference classification.  Thus, the effect of *not* applying section 202(e) after several years of operation is to cut down the accumulating backlog in the higher preference categories which, according to defendant, facilitates the smooth functioning of the process of allocating visas to countries with overwhelming demand.

amendment of the statute. This I cannot do.

For all of the foregoing reasons, summary judgment will be entered in favor of the defendant.