Linda D. JOHNSON et al., Appellees,

v.

Vera LIKINS et al., Appellants.

No. 77–1390.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 17, 1977.

Decided Dec. 27, 1977.

Rehearing and Rehearing En Banc Denied Jan. 23, 1978.

Warren R. Spannaus, Atty. Gen., John H. Daniels (argued), and Paul G. Zerby, St. Paul, Minn., Gary Flakne and James Bares, Minneapolis, Minn., on appendix and briefs, for appellants.

Eric S. Janus, Legal Aid Society of Minneapolis, Inc., Minneapolis, Minn., argued, on briefs and addendum, for appellees.

Before GIBSON, Chief Judge, HEANEY, Circuit Judge, and HUNTER, District Judge.*

ELMO B. HUNTER, District Judge.

Appellants, public officials legally responsible for the administration of the Aid to Families with Dependent Children (AFDC) program[1] in Minnesota, appeal from that portion of the district court's order which granted appellees' motion for summary judgment and permanently enjoined appellants from recouping prior overpayments made to certain AFDC recipients.

The named appellees (hereinafter plaintiffs), and members of the class they represent, are persons who, because of administrative error, have received overpayments of their AFDC benefits and whose future AFDC grants are subject to reduction, as a result of the State's recoupment process, at a time when the overpayments are no long-

---

* The Honorable Elmo B. Hunter, United States District Judge, Western District of Missouri, sitting by designation.

1. 42 U.S.C. § 601 *et seq.*

er in their possession. Although not made a part of the class definition, the parties have stipulated that, until notified by the State, the named plaintiffs were unaware of the overpayments having been made.

Upon receiving notice of the County Welfare Board's intention to reduce future benefit payments in order to recoup past overpayments, plaintiffs brought this action for injunctive relief, claiming that any reduction of future benefits would violate the "need determination" provisions of 42 U.S.C. § 602(a)(7) and the "earned income disregard" provisions of 42 U.S.C. § 602(a)(8). It is conceded that plaintiffs Johnson, Allan, and Morrison received overpayments of $495, $648, and $1278 respectively.

Before making an in-depth examination of the issues raised by this appeal, an overview of the AFDC program will be taken.

## I

### The AFDC Program

*Generally*

The AFDC program governed by 42 U.S.C. § 601, *et seq.,* provides aid, in the form of cash assistance and social services, to certain needy dependent children and their families. A concise overview of the AFDC program is contained in *King v. Smith,* 392 U.S. 309, 316, 88 S.Ct. 2128, 2133, 20 L.Ed.2d 1118 (1968), where the Court stated:

> The AFDC program is based on a scheme of cooperative federalism. * * * It is financed largely by the Federal Government, on a matching fund basis, and is administered by the States. States are not required to participate in the program, but those which desire to take advantage of the substantial federal funds available for distribution to needy children are required to submit an AFDC plan for the approval of the Secretary of

Health, Education, and Welfare (HEW) * * *. The plan must conform with several requirements of the Social Security Act and with rules and regulations promulgated by HEW.

Upon receiving federal approval of its plan, the State becomes eligible for expenditures made under the AFDC program. Federal funding is governed by what the Supreme Court has aptly described as a "rather complicated formula." *Id.,* at 318 n. 15, 88 S.Ct. 2128. *See* 42 U.S.C. § 603.

Despite the existence of federal statutory and regulatory guidelines to which participating States must adhere, "the [AFDC] program is basically voluntary and States have traditionally been at liberty to pay as little or as much as they choose, and there are, in fact, striking differences in the degrees of aid provided among the States." *Rosado v. Wyman,* 397 U.S. 397, 408, 90 S.Ct. 1207, 1216, 25 L.Ed.2d 442 (1970). These "striking differences" in the degrees of aid provided by the various participating States are due, no doubt, to the broad discretion given the States in establishing standards for AFDC eligibility. First, each participating State "must specify a statewide standard of need, which is the amount deemed necessary by the State to maintain a hypothetical family at a subsistence level," *Shea v. Vialpando,* 416 U.S. 251, 253, 94 S.Ct. 1746, 1750, 40 L.Ed.2d 120 (1974), thus serving as "a yardstick for measuring who is eligible for public assistance." *Rosado v. Wyman,* 397 U.S. 397, 408, 90 S.Ct. 1207, 1216, 25 L.Ed.2d 442 (1970).[2] "Second, it must be decided how much assistance will be given, that is, what 'level of benefits' will be paid." *Id.* Because Minnesota has elected to pay 100% of the standard of need, the amount of the assistance payment is generally determined by subtracting from the standard of need the recipient's "income and resources," as defined in 45 C.F.R.

---

2. Because "some States include in their 'standard of need' items that others do not take into account", *Rosado v. Wyman, supra* at 408, 90 S.Ct. at 1216, because this standard depends upon the peculiar conditions existing in each participating State, *King v. Smith, supra,* 392 U.S. at 318, 88 S.Ct. 2128, and because Congress left to the States the power to determine who is "needy" for purposes of AFDC, *id.,* standards of need vary from State to State.

§§ 233.20(a)(6)(iii–viii).[3] Consequently, all Minnesota AFDC recipients are maintained at subsistence level.

■ It should be noted, however, that federal law does not require any participating State to pay the full amount or any particular percentage of the "budget deficit."[4] Thus, that Minnesota has favored its residents with such ample AFDC benefits is the result not of federal mandate but, rather, of its choosing to liberally exercise its "great deal of discretion," *Rosado v. Wyman, supra* at 408, 90 S.Ct. 1207, and its "considerable latitude in allocating [its] AFDC resources."

*The AFDC Work Incentive*

■ Because of the method by which AFDC benefits are computed, receipt of outside income generally causes a reduction in the amount of the benefit payment. While most income is offset against the standard of need on a dollar-for-dollar basis, federal law gives special treatment to a certain portion of earned income. 42 U.S.C. §§ 602(a)(7) and (8) provide, in pertinent part, that a State AFDC plan must:

(7) except as may be otherwise provided in clause (8), provide that the State agency shall, *in determining need,* take into consideration any other income and resources of any child or relative claiming aid to families with dependent children * * *

(8) provide that, in making the determination under clause (7), the State agency—

(A) shall with respect to any month disregard—
(i) * * *
(ii) in the case of earned income of a dependent child not included under clause (i), a relative receiving such aid, and any other individual * * * whose needs are taken into account in making such determination, the first $30 of the total of such earned income for such month plus one-third of the

remainder of such income for such month. * * * [Emphasis added.]

Clearly, the purpose of the "30 and ⅓" earned income disregard provision is to encourage gainful employment. The Senate Finance Committee, in recommending passage of this provision, stated:

The committee is recommending the enactment of a series of amendments to carry out its intent of reducing the AFDC rolls by restoring more families to employment and self-reliance.

The first series of amendments is designed to encourage and make possible the employment of adults in AFDC families. Three provisions are aimed at this purpose:

\* \* \* \* \* \*

(3) A requirement that all States exempt part of the AFDC recipient's earnings to provide incentives for work in regular employment.

\* \* \* \* \* \*

A key element in any program for work and training for assistance recipients is an incentive for people to take employment. If all the earnings of a needy person are deducted from his assistance payment, he had no gain for his effort. Currently, there is no provision in the Social Security Act under which States may permit an employed parent or other relative under the AFDC program to retain some of his earnings. There is no doubt, in the opinion of the committee, that the number of recipients who seek and obtain employment will be greatly increased if, in conjunction with the work incentive program, there may be added to title IV some specific earnings incentives for adults to work.

Report of the Senate Finance Committee, S.Rep. No. 744, 90th Cong., 2d Sess. (1967), reprinted in [1967] U.S.Code Cong. & Admin.News, pp. 2982, 2994.

---

**3.** This difference between the State's standard of need and the recipient's income and resources is known as the "budget deficit."

**4.** *See* note 3, *supra.*

Plaintiffs contend, and the district court held, that Minnesota's program for recouping AFDC overpayments transgresses the spirit of the "earned income disregard" provision of the statute. An examination of that recoupment program is now in order.

## II

### Recoupment of Overpayments

The Department of Health, Education, and Welfare has, by regulation,[5] provided that a State's AFDC plan must "[s]pecify uniform Statewide policies for * * * [r]ecoupment of overpayments of assistance." The regulation further provides:

The State may not recoup any overpayment previously made to a recipient * * [u]nless the recipient has income or resources exclusive of the current assistance payment currently available in the amount by which the agency proposes to reduce payments * * *.

The Minnesota regulation provides, in part:

Overpayments may be resolved through:

\*    \*    \*    \*    \*    \*

Recoupment of an amount up to one-half the current monthly earnings disregard. This is accomplished by reducing the AFDC grant in the amount of the recoupment.

\*    \*    \*    \*    \*    \*

Recoupment should be made in all cases in which an AFDC recipient receives an overpayment and has disregarded income. This includes overpayments due to agency error as well as recipient error.[6]

At the time of trial, Minnesota permitted recoupment only of such overpayments made during the 12 months immediately preceding the State's discovery of the error

and the giving of notice to the recipient. At oral argument, however, the court was advised by the defendants-appellants that recent legislation limits recoupment to only those overpayments made during the three months immediately preceding discovery. The recoupment process does, of course, continue for as long as is required to offset all overpayments that are subject to recoupment. Thus, while Minnesota's recoupment procedure is now subject to a three-month retrospective limitation, no arbitrary prospective deadline is imposed.

Not only is the Minnesota recoupment scheme limited as to time, it is, as the language of the regulation indicates, limited as to the amount which may be recouped in any given month. As recoupment can reduce the current AFDC benefits to no more than an amount equal to one-half the current monthly earnings disregard, the recipient, during the recoupment process, is always left with a subsistence level income plus one-half of any income which federal law requires to be disregarded in the "need determination" process.[7]

Whether the Minnesota recoupment process transgresses federal law pertaining to "earned income disregard" will now be determined.

## III

### Does Minnesota's Recoupment Policy Violate Federal Law?

■ What is at issue is whether, focusing on the federal recoupment regulation, the "disregarded" portion of earned income must remain inviolate or may be considered as "income or resources exclusive of the current assistance payment currently available" for purposes of recoupment or wheth-

---

5.  45 C.F.R. § 233.20(a)(12)(i)(A).

6.  Again, the only matter with which this court is presently concerned is agency error overpayments where the recipient is not guilty of misconduct or culpable omission.

7.  The hypothetical provided the court by defendants at oral argument is helpful in understanding Minnesota's recoupment formula: An AFDC recipient having a monthly earned in-

come of $120 would, according to the federal statute, have the first $30 and one-third of the remainder disregarded for purposes of "need determination." Thus $60 ([30 + (⅓ x 90)]) of the recipient's $120 earned income is disregarded in computing the benefit amount. Recoupment of overpayments may not exceed one-half of this disregarded amount. Thus, in the hypothetical given, the State would recoup at a rate of $30 per month.

er focusing on the "need determination" statute, the reduction in the assistance payment which results from the recoupment process contravenes the requirement that a certain portion of income be "disregarded" in determining need. The district court concluded that "such invasion of the earned income disregard is clearly contrary to the meaning and purpose of 42 U.S.C. § 602(a)(8)." We disagree.

Initially, it should be noted that there is no federal statutory provision that "either explicitly authorizes or in terms forbids recoupment for overpayments of AFDC assistance." *Swasey v. Whalen,* 562 F.2d 831, at 833 (1st Cir. 1977). Minnesota's provisions are not literally reached by federal law. The federal statute does not deal with recoupment in any way, and by its terms requires the earned income disregard *only* in the calculation of need. *McGraw v. Berger,* 537 F.2d 719, 724 (2d Cir. 1976).[8]

Further, as Congress considered only the general purpose of the disregard provision and not its specific impact on recoupment, little is resolved by reference to the provision's legislative history. Our inquiry is thus relegated to a consideration of the policies underlying the statute.

█ An insight into those policies begins with the realization that the amount of the AFDC grant is not, as a matter of federal law, an inevitable and predictable product of the need determination process. As observed earlier, because each participating State has "a great deal of discretion" in establishing a standard of need, and because each State is free to limit its level of benefits "irrespective of how far short the limitation may fall of the theoretical standard of need," *Rosado v. Wyman, supra* 397 U.S. at 409, 90 S.Ct. at 1216,[9] there is little

direct, federally-mandated connection between a State's determination of its standard of need under 42 U.S.C. §§ 602(a)(7) and (8) and the level of AFDC benefits which it offers its residents.

From this bifurcation of the need determination and recoupment processes, the Court concludes two things: first, that resort to disregarded income pursuant to the Minnesota recoupment provision does not detract from or in any way color the State's earlier compliance with the statutorily-required disregard of that income in calculating need; and second, that Congress intended the amount of the AFDC benefit to be based upon more than just consideration of recipient need. Regarding the latter, the Second Circuit considered "the States' authority to set the amount of payment below the amount of need as evidence that the AFDC grant is a function not only of the recipient's need, but also of the administrative imperatives that may be dictated by a State's limited fiscal resources." *McGraw v. Berger, supra* at 724.

A careful appraisal of the Congressional concern that States encourage AFDC recipients to achieve gainful employment vis-a-vis Congress' appreciation of and respect for limited State resources persuades this court that Minnesota's recoupment scheme is consistent with the policies which underlie federal law governing the AFDC program.

Of most significance is the fact that Minnesota's present recoupment policy is a very limited one. As detailed above, it permits the State to recover, in administrative error cases, only those overpayments that were made in the three months immediately preceding discovery of the overpayment and the giving of notice to the recipient.[10] Fur-

---

8. As was earlier observed, the language of the statute requires only that States disregard a portion of the recipients' earnings "in making the determination under clause (7)," that is, "in determining need." 42 U.S.C. §§ 602(a)(7) and (8).

9. As summarized by the Second Circuit: "[S]tates are free not only to .set the standard of need under the AFDC program, but also to

determine how much of an applicant's admitted need is to be met." *McGraw v. Berger,* 537 F.2d 719, 723 (2d Cir. 1976).

10. Minnesota's statute provides, in part: "If any amount of aid to families with dependent children assistance is paid to a recipient thereof in excess of the payment due it shall be recoverable by the local agency. If the agency notifies the recipient in writing of an overpayment

ther, regardless of the size of the overpayment, an amount equal to one-half of the earned income disregard remains immune to the recoupment process.

■ Thus, during recoupment, those AFDC recipients who are employed remain in better financial condition than those who are not. While the work incentive *may* be temporarily and partially reduced,[11] it is far from destroyed.[12] Further, the work incentive is not the only policy consideration which affects the issue before the court; rather, an additional, and very potent, policy consideration—"the administrative imperatives that may be dictated by a State's limited financial resources"—does exist. The Minnesota Supreme Court, in *Steere v. State Department of Public Welfare*, Minn., 243 N.W.2d 112, 126 (1976), concluded that to prohibit recoupment of AFDC overpayments via resort to the disregarded portion of earned income "would disturb the fiscal integrity of AFDC and would give overpaid recipients an unfair windfall when compared with other recipients." As the district court in this case observed: "[W]elfare money is scarce and * * * failure to recoup overpayments will eventually work hardship on other faultless recipients by reducing the total amount of money available for distribution." In fact, "bowed by and bowing to fiscal realities, a State foreclosed from such recoupments *might well be obliged to depart from a policy of granting AFDC payments in full satisfaction of need, in which case 'hungry mouths' would constitute the rule, rather than the exception.*" [Emphasis added.] *McGraw v. Ber-*

ger, 410 F.Supp. 1042, 1051 n. 5 (S.D.N.Y. 1976), *aff'd*, 537 F.2d 719 (2d Cir. 1976). Clearly, therefore, Minnesota's interest in recouping AFDC overpayments must be deemed a substantial one, deserving of our most serious consideration.[13]

In considering the possible impact which acceptance of the State's fiscal integrity argument might have upon the work incentive policy of the federal statute, it is important to note that Congress did not intend the earned income disregard to be its sole vehicle for attaining its work incentive policy goals; rather, other provisions, such as the statutory exclusion of "any expenses reasonably attributable to the earning of any * * * income," 42 U.S.C. § 602(a)(7), the establishment of a new and elaborate training program, 42 U.S.C. §§ 630–644, making provision for state day care services, 42 U.S.C. § 622(a)(1)(C), and the imposition of sanctions should the recipient quit his employment because of recoupment, 42 U.S.C. § 602(a)(8)(B) and (C), also serve as work incentives.

The continued operation of such other work incentives during the recoupment process, when combined with the limited effect (if any effect at all) which the Minnesota recoupment scheme has upon the work incentive provided by the earned income disregard provision, causes plaintiffs' work incentive argument to pale in comparison to the fiscal necessities which support the State's position. Given the consequences which inevitably flow from the finite nature of the State's resources,[14] we

due solely to local agency error within three months after the overpayment, the agency may commence recovery of the overpayment during the year after the notification is received by the recipient * * *." Minn.Laws 1977, ch. 412, § 5.

11. There was no evidence that any reduction in work incentive did in fact result from Minnesota's recoupment program, nor that such a reduction would be a significant possibility.

12. As was observed in *Steere v. State Department of Public Welfare*, Minn., 243 N.W.2d 112, 126 (1976): "[T]he Minnesota regulations allow appellant to retain one-half of her disregarded income, *and that retention constitutes*

*an incentive to her to keep her job and continue earning income.*" [Emphasis added.]

13. The Supreme Court has recognized these fiscal realities with which state welfare agencies are faced. In *Jefferson v. Hackney*, 406 U.S. 535, 541, 92 S.Ct. 1724, 1729, 32 L.Ed.2d 285 (1972), the Court observed: "[S]ince Texas' pool of available welfare funds is fixed, any increase in benefits paid to the working poor would have to be offset by reductions elsewhere."

14. The district court in *McGraw, supra*, at 1051 n. 5, stated the consequence thus: "[B]owed by and bowing to fiscal realities, a State foreclosed from such recoupments might well be

know of no policy that would favor the innocent recipient of windfall benefits (*i. e.*, benefits to which the recipient is not entitled and, under the facts of this case, which are in excess of the standard of need) over those who, by virtue of federal and state law, are entitled to benefits in such an amount as to bring their standard of living up to a subsistence level.

## IV

### Conclusion

After a careful review of Minnesota's recoupment scheme, and the federal law applicable thereto, we are firmly convinced that the State's position serves as a reasonable accommodation of two policies which, though they compete and conflict under the facts of this case, both received Congressional countenance. It is noteworthy that the two circuits which have considered the issue and the Department of Health, Education, and Welfare support our conclusion that the Minnesota recoupment regulation does not run afoul of federal law.[15]

Accordingly, we reverse the granting of judgment in favor of appellees and the issuance of the injunction which resulted therefrom.

Reversed.

HEANEY, Circuit Judge, dissenting.

I would affirm on the basis of the well reasoned opinion of Earl R. Larson, United States Senior District Judge for the District of Minnesota. It is clear that the purpose of Congress in enacting the earned income disregard provisions of the Social Security Act was to encourage adult AFDC recipients to obtain gainful employment and to reduce or eliminate their dependence on AFDC benefits. 42 U.S.C. § 601; Report of the Senate Finance Committee, S.Rep. No. 744, 90th Cong., 1st Sess. (1967), *reprinted in* [1967] U.S.Code Cong. & Ad.News 2834, 2982–2985, 2994–2996.

It cannot be disputed that recoupment involves a reduction in benefits to the recipients. That reduction necessarily reduces the work incentive provided by the earned income disregard provisions.[1] Moreover, we note that the closer the recipient is to self-sufficiency, the more he or she is penalized by recoupment. The continued operation of other work incentive provisions, including sanctions for quitting, is not sufficient to achieve the clear congressional purpose. Indeed, as the District Court noted, "Congress regarded the value of the carrot [the earned income disregard] as possibly greater than that of the stick [the sanctions], for the disregard provision was found to be necessary despite its high cost (particularly in comparison to the cost-reducing effect of negative sanctions)."

We recognize that the State of Minnesota is entitled to maintain the fiscal integrity of its AFDC program. However, it should do so by improving the administration of its AFDC program so that agency errors neces-

obliged to depart from a policy of granting AFDC payments in full satisfaction of need * * *."

15. *Swasey v. Whalen*, 562 F.2d 831 (1st Cir. 1977); *McGraw v. Berger*, 537 F.2d 719 (2d Cir. 1976).

The Department of Health, Education, and Welfare, through both its amicus brief filed herein and its proposed regulation, supports the State's position. The proposed regulation provides, in part: "The State agency may recoup from current assistance payments * * * only if * * * [t]he recipient has income exclusive of current assistance and of the income that was considered in determining the amount of such assistance. * * * For purposes of paragraph (b)(1)(ii)(A) of this section, the 'income currently available' may include * * * disregarded income [with certain ex-

ceptions not here relevant]." *See* proposed 45 C.F.R. §§ 235.15(b)(1)(ii)(A) and (b)(2), 41 Fed. Reg. 8068 (Feb. 24, 1976). Further, in its amicus brief, HEW takes the position that "recoupment from disregarded income of prior overpayments caused by agency error is fully consistent with the purpose of Title IV and is permitted by H.E.W. regulations."

1. In Minnesota, the total income available to recipients remains at or above the standard of need, even during recoupment because of the decision of the State to fund at full need levels. However, as the District Court noted, in states that do not fund at full need level, recoupment "robs the working poor of their only chance to achieve a standard of living that approximates subsistence level."

sitating recoupment do not occur. The gain to the State of Minnesota through recoupment in instances where there is no recipient fault is minimal and is not sufficient to justify a recoupment scheme which contravenes the clear congressional purpose of reducing and eventually eliminating the reliance of adult AFDC recipients on the dole. Indeed, recoupment in such circumstances will discourage ablebodied men and women from seeking and retaining employment.