739 F.2d 370
 STATE OF MINNESOTA, by its Attorney General, Hubert H.
HUMPHREY, III, and Leonard W. Levine, the
Commissioner of Public Welfare, and
Joyce Thul, Petitioners,
v.
Margaret HECKLER, in her official capacity as Secretary of
the United States Department of Health & Human
Services, Respondent.
 No. 83-2212.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Feb. 16, 1984.
Decided July 24, 1984.
 
 Eric S. Janus, Law Offices of the Legal Aid Soc. of Minneapolis, Inc., Minneapolis, Minn., for petitioner Joyce Thul.
 Hubert H. Humphrey, III, Atty. Gen., State of Minn., James E. Lackner, Mary Ann Bernard, Sp. Asst. Attys. Gen., St. Paul, Minn., for petitioner State of Minn.
 J. Paul McGrath, Asst. Atty. Gen., Washington, D.C., Randolph W. Gaines, Deputy Asst. Gen. Counsel for Litigation, John B. Watson, Chief of Assistance Payments Litigation, Gwenda Jones Kelley, Atty., Social Sec. Div., Dept. of Health and Human Services, Baltimore, Md., for respondent.
 Before LAY, Chief Judge, and HEANEY and BOWMAN, Circuit Judges.
 LAY, Chief Judge.
 
 
 1
 This petition for review is brought by the State of Minnesota, challenging the Secretary's disapproval of the State's proposed modification to its standard of need and level of benefits affecting recipients with earned income under its administration of the Aid to Families with Dependent Children Program (AFDC). In 1981 Congress passed the Omnibus Budget Reconciliation Act (OBRA), amending the treatment accorded earned income under the AFDC program. Pub.L. No. 97-35, 95 Stat. 357, 843 (1981), amending 42 U.S.C. Secs. 602-676. The Minnesota legislature incorporated these amendments into its state AFDC plan, Minn.Stat. Sec. 256.74 (1982). Minnesota, however, perceived that the federally mandated amendments would have a work disincentive effect in Minnesota, which in turn would result in increased costs to the state. Minnesota's proposed plan was disapproved in a final decision of the Department of Health and Human Services (HHS) on the ground that it violated statutory and regulatory provisions. We affirm.
 
 
 2
 The AFDC program is a public assistance program run jointly by the federal government and the participating states. The process of determining whether an applicant is eligible for assistance and, if so, how much, is controlled partly by federal statute and HHS regulations and partly by state law. See generally Rosado v. Wyman, 397 U.S. 397, 408-09, 90 S.Ct. 1207, 1215-16, 25 L.Ed.2d 442 (1970); King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968).
 
 
 3
 The issue before us focuses on the "earned income disregards" applicable in the grant determination process. Generally, receipt of outside income is offset against the standard of need and thus causes a reduction in the amount of the benefit payment. The earned income disregards, however, provide special treatment for earned income by allowing the recipient to take certain deductions from his or her earned income.[1] Prior to OBRA, a family was allowed to deduct from their income "any expenses reasonably attributable to the earning of any such income." 42 U.S.C. Sec. 602(a)(7); see generally Shea v. Vialpando, 416 U.S. 251, 94 S.Ct. 1746, 40 L.Ed.2d 120 (1974) (state plan must allow for all actual expenses to be disregarded). This work-expense disregard assured that the portion of a family's budget allocated to meeting the expenses generated by working (such as transportation, uniforms, and child care) would not be considered available to meet subsistence needs, thereby avoiding a work disincentive. The AFDC program's treatment of earned income also included work incentives.[2]
 
 
 4
 In 1981 Congress enacted OBRA. OBRA drastically altered the treatment of earned income for AFDC families. The duration of the work incentive was limited as was its effect. See 42 U.S.C. Sec. 602(a)(8)(B)(ii)(II); supra note 2. More relevant to the issue here, the treatment of work expenses was changed. The open-ended work-expense disregard was replaced with a standardized $75 deduction for work expenses and a deduction of up to $160 per child for child care expenses.[3] 42 U.S.C. Sec. 602(a)(8). Additionally, the Act now provides that no family is eligible for aid if its gross income exceeds 150% of the standard of need. Id. Sec. 602(a)(18). Finally, if a family receives a lump-sum payment, such as an inheritance, that is greater than its monthly standard of need, the family is ineligible for aid in that month and for the number of months obtained by dividing the total of the lump-sum and any other income by the standard of need. Id. Sec. 602(a)(17). (Prior to OBRA, a lump sum in excess of the standard of need rendered a family ineligible for aid in the month it was received and thereafter, only to the extent that it was not spent. See generally Faught v. Heckler, 736 F.2d 1235 (8th Cir.1984) (lump-sum rule applies to all recipients, not just those with earned income)). The Secretary contends that the Minnesota proposal violates these statutory provisions as well as certain regulations promulgated under the Act.
 
 
 5
 Because of conditions peculiar to its state, Minnesota predicted that $75 would be insufficient to cover its residents work expenses,[4] and thus that OBRA would have a work disincentive effect in Minnesota. Minnesota also predicted that because of the work disincentive, recipients would quit work and rely solely on federal grants to meet their needs, thereby costing the government more money than if the recipients continued to work. Admittedly designed to counteract these effects, Minnesota proposed the following changes to their program. First, Minnesota proposed to increase the standard of need for families with earned income 35% above that for families without earned income. Second, to prevent a windfall, the level of benefits to be paid families with earned income would be limited to 74% of the increased standard of need. (Presumably others would receive 100% of their unmet need.)[5] In other words, families with earned income would have a higher standard of need but potentially would be paid a lesser proportion of it.[6]
 
 
 6
 Our discussion focuses on the Secretary's contention that the federal recognition of work expenses in section 402(a)(8) precludes Minnesota from including work expenses in the determination of the standard of need.[7]
 
 
 7
 In defense of its plan Minnesota relies primarily on its undisputed authority and discretion to determine its standard of need and level of benefits. Admitting that its plan is designed to ward off the predicted effects of OBRA in Minnesota, the state asserts that its plan is not thereby precluded because those effects were unintended and because its plan is a justified response to the actual needs of the AFDC recipients who work. Minnesota contends that section 402(a)(8) facially purports to alter only the method of computing the net income of recipients with earned income, an aspect of the AFDC program traditionally within federal control. Minnesota has fully incorporated the OBRA provisions into its plan for determining need, and then altered only the standard of need and level of benefits. Minnesota asserts that therefore it has not contravened the statutory mandate of OBRA. See Jefferson v. Hackney, 406 U.S. 535, 545, 92 S.Ct. 1724, 1730, 32 L.Ed.2d 285 (1972) (Court would not imply a congressional intrusion into state's traditional authority to compute their standards of need, income, and benefits). Rather than frustrating the congressional intent, Minnesota contends that its manipulation of the standard of need to ameliorate effects of the federally mandated provisions is an exercise of its discretion, which is neither precluded by nor inconsistent with OBRA; as such, it is merely a reflection of the cooperative nature of the AFDC program structure. See Rosado v. Wyman, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970) (congressional amendment of one aspect of the AFDC plan did not preclude the state's attempt to ameliorate the effects thereof by manipulation of another aspect of the program that was in the state's discretion). In Rosado, the Court found that the states were required by federal mandate to adjust their existing standards of need to reflect the changes in the cost of living. However, this did not preclude them from then exercising their discretion by adjusting downward the level of benefits that they paid. See also Johnson v. Likins, 568 F.2d 79 (8th Cir.1977) (Minnesota plan to recoup AFDC overpayments by reducing grants by one half of the 30 + 1/3 disregard upheld).
 
 
 8
 The standard of need is intended to be the actual cost of a subsistence level of existence for a hypothetical family. It is the "yardstick" for measuring financial eligibility for assistance. See Quern v. Mandley, 436 U.S. 725, 737, 98 S.Ct. 2068, 2075, 56 L.Ed.2d 658 (1978). We recognize the broad discretion given to the states to determine their standards of need and levels of benefits. See, e.g., id; Jefferson v. Hackney, 406 U.S. at 541, 92 S.Ct. at 1729; Dandridge v. Williams, 397 U.S. 471, 478, 90 S.Ct. 1153, 1158, 25 L.Ed.2d 491 (1970). Accordingly, the items of need taken into account by a state in its standard of need can vary, as can the valuation accorded similar items. See, e.g., Quern v. Mandley, 436 U.S. at 737, 98 S.Ct. at 2075. This discretion, however, is not absolute. First, the standard of need cannot be computed in such a way that it "obscures" the actual standard of need. See Rosado v. Wyman, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970). This limitation appears to be based on the theory that a state's standard of need is to be an accurate reflection of the cost of living in that state. In this regard, the standard of need is not determinative of the amount of benefits paid, but rather serves to reveal the full extent of the state's public responsibility. Therefore, it should not be manipulated or "obscured" to serve some other end. See id. at 413, 90 S.Ct. at 1218. Thus, the states are afforded discretion apparently in recognition of the fact that the items--and their value--relevant to the cost of living vary from state to state. Second, the discretion in setting its standard of need is subject to federal control. See, e.g., 42 U.S.C. Sec. 602(a)(23) (requiring states to adjust their standards of need to reflect the cost of living); Rosado v. Wyman 397 U.S. 397, 90 S.Ct. 1207. Accordingly, the discretion must be exercised in a manner that is not inconsistent with, or contrary to, the Constitution or the Social Security Act. Jefferson v. Hackney, 406 U.S. at 541, 92 S.Ct. at 1729.
 
 
 9
 We are not persuaded that the increased standard of need proposed by the State of Minnesota is a legitimate exercise of its discretion. Both Rosado and Johnson involved a state's exercise of discretion in setting their level of benefits. The level of benefits aspect of the program, however, is subject to different limitations than is the state's determination of the standard of need. The standard of need is intended to reflect the actual cost of a subsistence level of existence; accordingly, the states' discretion appears to be in recognition of the variations among the states in the relevant items, as well as their valuation. The states' discretion in setting their level of benefits, however, is intended to allow states to factor in budgetary and policy concerns. More importantly, the decisions in Rosado and Johnson were premised on congressional intent. In Rosado the Court did recognize that New York could pare down its level of benefits to ameliorate the effect of complying with a federally mandated adjustment to their standard of need. However, the Court held that New York's re-computation of its standard of need was impermissible because it "skirted" the federal mandate that states reevaluate their existing standards of need. The Court found that Congress's intent was to update the standards of need in order to force states to acknowledge the extent of their public responsibility. A pared down level of benefits would not circumvent that goal. Rosado, 397 U.S. at 413, 90 S.Ct. at 1218. Similarly, in Johnson the court found that the Minnesota plan did not detract from the state's compliance with the federally mandated disregard. Johnson, 568 F.2d at 84.
 
 
 10
 We agree with Minnesota that the federal amendments to the determination of need process do not facially preclude Minnesota's alteration of its standard of need. To determine whether Minnesota's proposed increased standard of need for recipients with earned income is a valid exercise of its discretion or whether it is precluded by the federal recognition of work expenses in section 402(a)(8), we must examine Minnesota's plan in light of the statutory changes created by OBRA and the legislative history behind them. See Shea v. Vialpando, 416 U.S. 251, 94 S.Ct. 1746, 40 L.Ed.2d 120 (1974); Jefferson v. Hackney, 406 U.S. 535, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972). We must, of course, endeavor to interpret the statute in light of the purposes Congress sought to serve. Chapman v. Houston Welfare Rights Organization, 441 U.S. 600, 608, 99 S.Ct. 1905, 1911, 60 L.Ed.2d 508 (1979). In this case, we are concerned with the overall purposes of the AFDC program as well as Congress's goals in amending the program in OBRA.
 
 
 11
 The general purpose of the AFDC program is to provide financial assistance to needy families with dependent children in order to encourage and preserve a family environment. 42 U.S.C. Sec. 601. A second, closely related purpose is to help and encourage the adult members of such families "to attain or retain capability for the maximum self-support and personal independence consistent with the maintenance of continuing parental care and protection." Id. These fundamental principles were embodied in the original codification of the program and have not been amended by OBRA.
 
 
 12
 Although the purpose of encouraging self-sufficiency has remained constant, the changes in OBRA reveal a new methodology of pursuing this goal. Congress's goal in enacting OBRA clearly was to reduce federal spending. See "Views of the Committee on the Budget," S.Rep. No. 139, 97th Cong. 1st Sess. 3, reprinted in 1981 U.S.Code Cong. & Ad.News 396, 397-98; see also Philadelphia Citizens in Action v. Schweiker, 669 F.2d 877, 879 (3d Cir.1982). In OBRA, Congress replaced the open-ended work expense disregard with a flat $75 disregard. The articulated motivation for this switch was to curb abuses and alleviate the administrative inconvenience inherent in individualized determinations and to increase uniformity in treatment of work expenses:
 
 
 13
 Because Federal law neither defines nor limits what may be considered a work-related expense, there is now great variation among the States and many instances of abuse. In addition, the requirement for itemization of individual work expenses has resulted in administrative complexity and error. It is the committee's belief that the change in the law with respect to work expenses would have the effect of limiting abuse of the work expense disregard and also result in simpler and more accurate determination of benefits.
 
 
 14
 S.Rep. No. 139, 97th Cong. 1st Sess. 501-02, reprinted in 1981 U.S.Code Cong. & Ad.News 768.
 
 
 15
 Moreover, it is readily apparent in the legislative history that Congress was aware of the possible work disincentive that the OBRA provisions would have.[8] In enacting OBRA, Congress was acting under the belief that the pre-OBRA work incentives were not successful in encouraging self-sufficiency and merely cost the government money:
 
 
 16
 The $30 and one-third disregard was added to the law in 1967 because it was believed that it would operate as an incentive for mothers to move into employment and to become self-sufficient. Statistics indicate that this has not been the case. For many years the Department of Health and Human Services (DHHS) has been conducting a survey of AFDC recipients which includes the question of employment status of mothers. Results of these surveys show that, despite the work incentive and other amendments added to the law in an effort to increase employment, the percentage of AFDC mothers who work has remained constant.
 
 
 17
 Id. at 502; see also Dickenson v. Petit, 728 F.2d 23, 24 (1st Cir.1984). Accordingly, it appears that Congress consciously retreated from a financial incentive plan to encourage self-sufficiency to a different method--one which it apparently believed was more cost effective. See James v. O'Bannon, 715 F.2d 794 (3d Cir.1983). In this regard, OBRA statutorily mandated that participation in work programs be a condition of eligibility for aid. See 42 U.S.C. Sec. 602(a)(19) (1981); see also id. Sec. 609.
 
 
 18
 The Minnesota plan may faithfully incorporate the changes mandated by OBRA and its plan may not be directly precluded by federal law. However, in light of the legislative intent of OBRA, we are persuaded that the plan is precluded by federal law. In OBRA Congress clearly intended to remove the system of encouraging self sufficiency through financial incentives. It perceived such a system to be ineffective, costly, and allowing persons with alternative sources of income to use federal grants as an income supplement. In its place, Congress imposed a system that prescribes a limited recognition of work expenses, and encourages recipients to work and obtain self sufficiency through mandatory employment programs. With due regard to Minnesota's worthwhile goals of saving money and reintroducing a work incentive into the AFDC program, we find that its plan, admittedly calculated to account for work expenses not covered by the federally mandated allowance, clearly counteracts the Congressional intent in OBRA. We agree with the Secretary that the Congressional imposition of a limit to the recognition of work expenses would be circumvented by allowing Minnesota to allow an additional recognition. Accordingly, we find that the plan is precluded by federal law.
 
 
 19
 In light of our decision on this ground, we need not entertain the other arguments against the Minnesota plan submitted by the Secretary.
 
 
 
 [1]
 The exact contours of the term "income" are not clear. The circuits are split on whether mandatory payroll deductions are intended to be regarded as a work expense to be compensated for by the $75 federal work expense disregard. Compare James v. O'Bannon, 715 F.2d 794 (3d Cir.1983) (income does include mandatory payroll deductions) and Bell v. Massinga, 721 F.2d 131 (4th Cir.1983) (same) with Turner v. Prod, 707 F.2d 1109 (9th Cir.1983), cert. granted sub. nom. Heckler v. Turner, --- U.S. ----, 104 S.Ct. 1412, 79 L.Ed.2d 739 (1984) (income does not include mandatory payroll withholdings). Minnesota apparently adheres to the Secretary's position that the $75 figure was intended to include payroll deductions
 
 
 [2]
 Recipients were allowed to disregard from their earned income the first $30, plus one-third of the remainder of their earnings ("30 + 1/3 disregard"). 42 U.S.C. Sec. 602(a)(8)(A)(ii). As part of OBRA, Congress limited the application of the 30 + 1/3 disregard to the first four months of working. Additionally, the 30 + 1/3 disregard now is applied after the other earned income disregards. See 42 U.S.C. Sec. 602(a)(8)(B)(ii)(II). These changes largely eliminate the work incentive and have the effect of increasing the amount of the recipient's income that is countable for eligibility purposes without there being any actual increase in income
 
 
 [3]
 Section 402(a)(8)(A), as amended by OBRA, provides in part that in the determination of need each state's plan
 (ii) shall disregard from the earned income of any child or relative applying for or receiving aid to families with dependent children, or of any other individual (living in the same home as such relative child) whose needs are taken into account in making such determination, the first $75 of the total of such earned income for such month (or such lesser amount as the Secretary may prescribe in the case of an individual not engaged in full-time employment or not employed throughout the month);
 (iii) shall disregard from the earned income of any child, relative, or other individual specified in clause (ii), an amount equal to expenditures for care in such month for a dependent child, or an incapacitated individual living in the same home as the dependent child, receiving aid to families with dependent children and requiring such care for such month, to the extent that such amount (for each such dependent child or incapacitated individual) does not exceed $160 (or such lesser amount as the Secretary may prescribe in the case of an individual not engaged in full-time employment or not employed throughout the month).
 42 U.S.C. Sec. 602(a)(8)(A)(ii), (iii).
 
 
 [4]
 Minnesota predicted that the negative impact of OBRA was exacerbated in Minnesota because of its relatively high individual income tax rates. Minnesota contends that for a large number of AFDC families the $75 standardized deduction is insufficient to compensate even for mandatory payroll deductions, let alone for other traditional work expenses. But see note 2 supra
 
 
 [5]
 The statute reads, in relevant part:
 (6) The commissioner shall increase the standard of need for persons with earned income in effect on January 1, 1982, by 35 percent for each assistance unit. The maximum amount paid to an assistance unit shall be no more than 74 percent of the increased standard of need. Whenever the commissioner increases the maximum payment amount for all assistance units, the commissioner shall increase the maximum standard of need by an equal percentage.
 To determine the amount of assistance to be paid to an assistance unit, net income shall be determined in a manner consistent with this chapter and applicable federal law. Net earned income shall be subtracted from the increased standard of need for an assistance unit of the appropriate size and composition to determine the grant amount, except that the grant shall not exceed the standard of need in effect on January 1, 1982 for an assistance unit of the same size and composition.
 Minn.Stat. 256.74 subd. 1(6) (1982).
 
 
 [6]
 A set of calculations based upon the income of one family will illustrate the different systems of determining the amount of a grant
 Mary Headington has one child. The standard of need for a family of her composition is $368. Thus, if she did not work, Headington would be entitled to a grant of $368. Headington, however, does work and her gross income is $430. Her total work expenses are $255 of which $45 is taxes, $181 is child care expenses, and $29 is other work expenses.
 Under the pre-OBRA AFDC provisions, Headington's grant eligibility and amount would have been determined generally as follows. The agency first would have deducted the work incentive disregard ($30 plus one third of her remaining gross income), thus subtracting $163 from $430. Then it would have subtracted $255 for her work expenses, leaving Headington with an income of $12. This $12 would then have been offset against her grant eligibility of $368 and she would have collected a $356 grant per month. In effect, then, she would have an income of $786 (430 + 356) a month. Because her actual work-related expenses are $255, pre-OBRA she was left with $531 spendable income a month. Because she would have been entitled to a grant of $368 if she did not work, her financial incentive for working was $163. Note that despite financial incentives to work, Headington still costs the state less money if she continues to work ($356) than if she quit ($368).
 Under the post-OBRA method of calculating benefits, Headington is still eligible for a grant of $368 (the standard of need), and she still earns $430. From the $430, the agency now deducts $75 and $160, a total of $235, which reduces her gross income to a net income of $195. In our calculations we have ignored the 30 + 1/3 disregard because of its limited effect. The $195 is offset against the $368 to which she is eligible, entitling her to a grant of $173. The result is that Headington's actual income is $503 a month (430 + 173); her spendable income, however, is only $248 (503 - actual work-related expenses of 255). Thus Headington is receiving $248 for working when she could receive $368 from the state if she were to quit work. It is costing her $120 a month to work. The picture which should be emerging reveals that if Headington continues to work, she costs the state only $173; however, faced with losing $120 a month to work, it is unlikely that she would continue to work. If this eventually occurs, she then costs the state $368.
 Under the proposed Minnesota plan, still earning $430 and incurring actual work-related expenses of $255, Headington's benefits would be calculated as follows. The $430 would be reduced by $75 and $160, leaving $195. This $195, however, would be offset against a standard of need of $497 (368 + 35) leaving an unmet need of $302. Her level of benefits would be limited to $368, i.e. 74% of the increased standard of need, which is $368. Because the difference between her standard of need and her income (with deductions) is less than 74% of her standard, Headington's grant would be $302. Thus she would have a monthly income of $732 (grant of 302 + earned income of 430). Subtracting her actual work expenses of $255 from her monthly income of $732 she is left with $477 of spendable income a month. She has a $109 work incentive. However, she is costing the state $302 a month, as opposed to $368 if she were not working.
 
 
 [7]
 The Secretary also argues that the Minnesota plan violates specific statutory and regulatory provisions. Additionally, the Secretary also urges that the plan "obscures" the actual standard of need by creating a dual standard which in itself is impermissible and, alternatively, it is premised on work expenses which she contends are not a legitimate consideration in a state's determination of their standard of need
 
 
 [8]
 A speaker on behalf of the National Anti-Hunger Coalition emphasized the unrealistic nature of the proposal to limit the work expense to $75:
 In place of the current system, which encourages AFDC women to take low paying jobs by recognizing that even those jobs involve costs, the Reagan Administration proposes to operate AFDC in a world which does not exist, that is, a world in which full time day care can be purchased for $50 a month, and in which the combination of Social Security and FICA taxes, transportation and uniforms or other mandatory payroll deductions will never exceed $75 a month. Any working AFDC mother whose work-related expenses exceed those amounts will either have to absorb the costs out of minimum wage or lower earnings, or will have to quit working....
 Administration's Proposed Savings in Unemployment Compensation, Public Assistance, and Social Services Programs: Hearings Before the Subcomm. on Public Assistance and Unemployment Compensation of the House Comm. of Ways and Means, 97th Cong., 1st Sess., at 88-89 (1981) (statement of Christine Pratt-Marston). See also Spending Reduction Proposals, Hearings Before Senate Comm. on Finance, pt. J., 97th Cong. 1st Sess., at 227 (1981) (President of Children's Defense Fund testified that cap "of $75 per month for work expenses ... [does] not reflect the real costs of working).